STATE of Missouri, Respondent,

v.

Shelton H. ALLISON, Appellant.

No. WD 45421.

Missouri Court of Appeals, Western District.

Dec. 22, 1992.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 22, 1992.

Application to Transfer Denied Feb. 23, 1993.

Robert G. Duncan, Duncan, Coulson, Schloss, Chancellor & Norris, Kansas City, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before TURNAGE, P.J., and BRECKENRIDGE and HANNA, JJ.

BRECKENRIDGE, Judge.

Shelton Allison (Allison) appeals from his conviction for voluntary manslaughter, § 565.023, RSMo 1986,[1] and armed criminal action, § 571.015.1, for which he was sentenced to concurrent five and three-year terms of imprisonment, respectively. Allison raises three points on appeal. In his first point, Allison argues that the guilty verdict was not supported by sufficient evidence to establish the absence of self-defense beyond a reasonable doubt. Secondly, Allison asserts that the trial court erred in submitting to the jury in the self-defense instruction the issue of whether or not Allison was the initial aggressor. In his third point, Allison argues that the trial court erred in sustaining the State's objection during his direct examination to a question asking whether Allison believed the deceased could do him serious physical harm.

The judgment is affirmed.

David Biggins spent the night at Allison's home on October 4, 1990 in Kansas City, Missouri. Allison lived at the house with his brothers, Haston Allison (Haston) and Fred Allison. Biggins weighed 245 pounds and was 5'11". Allison weighed 210 pounds and was 6'3".

On the morning of October 5, 1990, Biggins and Allison went to Biggins' place of employment to pick up Biggins' paycheck. The two returned to Allison's home about noon after stopping to purchase liquor. Biggins, Allison and Haston sat on the porch drinking and talking. Biggins and Haston made another trip to the liquor store later in the afternoon. Biggins asked Allison to hold his wallet while he was gone to the liquor store. Allison testified that he gave Biggins' wallet back to him when Biggins returned and they continued to drink.

Later, Allison cut a neighbor's hair and Biggins' hair. Allison testified that shortly after he cut Biggins' hair, Biggins complained that his wallet was missing. Allison told Biggins he had last seen the wallet in Biggins' shoes. Biggins put on his shoes, walked into the house and then came back out to the porch. Biggins again complained to Allison, in a loud and angry manner, that his wallet was missing.

Allison testified that he asked Biggins to leave several times before going into the house to put the clippers away in his bedroom. Biggins followed Allison into the house. Allison testified that Biggins was "slamming stuff around" and beating on the dining room table and the television. Allison returned from his bedroom with a .22 caliber rifle. Allison testified that Biggins grabbed him by the throat, slammed him into the wall and broke the window by pushing Allison's head through it. The rifle discharged, which Allison says was accidental, striking Biggins in the left hip. Allison's testimony was that Biggins backed off only momentarily after being shot in the hip and then came charging back at Allison spouting verbal threats. Allison fired three more times fatally wounding Biggins. Allison testified that he shot Biggins because he was "frightened."

During this altercation, Haston Allison was speaking on the phone, first with his mother, Freddie Williams, and then with a friend, Bryan Skannal. Williams testified that she could hear yelling and banging in the background but could not identify the voices until Haston explained the situation. Williams testified that she heard Allison say "Go on man, I'm not going to let you hurt me" and the sound of glass breaking. Williams drove to Allison's home immediately after the phone conversation. She

---

1. All statutory citations are to Revised Missouri Statutes 1986, unless otherwise stated.

arrived after the shooting but before the police.

Bryan Skannal testified that he recognized the voices of Biggins and Allison arguing in the background as he talked to Haston on the telephone. In contrast to Williams' testimony, Skannal testified that he heard Allison threaten Biggins with physical harm.

Allison hid the gun under the kitchen sink after the shooting but told the police where the gun was when they arrived. Crime scene investigator Edwin Stowicki testified that, other than a broken window, there were no signs of a struggle, such as overturned furniture or scuff marks on the floor. Police officer Kevin Sullivan testified that he examined Allison for glass fragments and cuts, abrasions or marks that would be evidence of a struggle and found none.

Biggins' wallet was discovered, at the morgue, in his left sock just above his shoe. The autopsy revealed that Biggins was shot from a distance of at least eighteen inches and that his blood alcohol level was .245 percent.

Allison was charged by indictment in the Circuit Court of Jackson County with the class A felony of murder in the second degree, § 565.021, and armed criminal action, § 571.015.1. At trial by jury, second degree murder and the lesser included offense of voluntary manslaughter, as well as a self-defense instruction, were submitted to the jury. Allison was found guilty of the class B felony of voluntary manslaughter, § 565.023, and armed criminal action. Following the jury's recommendation, the court imposed prison sentences of five years and three years to be served concurrently. This appeal followed.

■ Allison argues in his first point on appeal that the evidence did not establish, beyond a reasonable doubt, the absence of self-defense because the evidence showed that Allison reasonably acted to defend himself against serious injury by Biggins who had been ordered to leave Allison's house and refused, grabbed and pushed Allison into a window, and came at Allison in a threatening manner even after a gun was pointed at him. Deadly force may only be used in self-defense when the following four elements are present: (1) an absence of aggression or provocation on the part of the defender; (2) a real or apparently real necessity for the defender to kill in order to save himself from an immediate danger of serious bodily injury or death; (3) a reasonable cause for the defender's belief in such necessity; and (4) an attempt by the defender to do all within his power consistent with his personal safety to avoid the danger and the need to take a life. *State v. Chambers*, 671 S.W.2d 781, 783 (Mo. banc 1984). Once the defendant has injected the issue of self-defense into the case, the burden shifts to the state to prove the absence of self-defense beyond a reasonable doubt. *State v. Stinson*, 714 S.W.2d 839, 840 (Mo.App.1986).

■ In reviewing the sufficiency of the evidence, the appellate court must consider the evidence, and the inferences drawn from it, in the light most favorable to the verdict and ignore all contrary evidence and inferences. *State v. Feltrop*, 803 S.W.2d 1, 11 (Mo. banc 1991). On appeal, the court will limit its review to a determination of whether sufficient evidence existed from which the jury might have found the defendant guilty beyond a reasonable doubt. *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). The jury, not the appellate court, is responsible for weighing the reliability and credibility of the witnesses. *State v. Sumowski*, 794 S.W.2d 643, 645 (Mo. banc 1990). "The jury is not bound by defendant's self-serving explanation." *Dulany*, 781 S.W.2d at 55. The jury may choose to accept or reject all, some or none of the testimony of any witness, including the defendant's testimony. *Id.*

■ Viewing the evidence in the light most favorable to the verdict, there is sufficient evidence to support the jury's finding that Allison did not act in self-defense. Only when undisputed and uncontradicted evidence clearly establishes self-defense is a defendant entitled to acquittal as a matter of law. *State v. Christie*, 604 S.W.2d

806, 808 (Mo.App.1980). Where there is conflicting evidence or when different inferences can reasonably be drawn from the evidence, it is a question of fact for the jury whether the defendant acted in self-defense. *Chambers,* 671 S.W.2d at 782; *Stinson,* 714 S.W.2d at 841. Allison's reliability and credibility in light of the physical evidence, as well as the credibility of Williams and Skannal regarding their conflicting accounts of what they heard in the background when talking to Haston on the phone, were for the jury to decide.

The jury rejected Allison's version of the shooting and it was within its province to do so. The evidence in the light most favorable to the verdict shows aggression on Allison's part and that Allison failed to do all within his power to avoid the need to take a life. Allison left the porch, where the argument with Biggins began, to retrieve a rifle from his bedroom and then returned to the dining room to confront Biggins with the rifle. Allison's actions contributed to the escalation of the argument from a shouting match into a deadly confrontation.

The evidence also failed to indicate a "real or apparently real necessity" for Allison to kill Biggins in order to avoid serious bodily injury or death. Biggins was unarmed and the evidence did not indicate that Biggins had the ability to kill or seriously injure Allison. Allison testified that he was "frightened" that Biggins would physically harm or injure him, however, there was little evidence to suggest Allison's fear was reasonable. Allison's brother Haston was in the living room and was available to assist Allison, if need be. In the two statements given to the police by Allison prior to trial, he did not mention any threats of harm by Biggins to support his retrieval of the gun. Investigation of the crime scene did not yield signs of a struggle, other than the broken window. Although the window was undeniably broken, there was no physical evidence which corroborated Allison's version that Biggins pushed his head through the window prior to the first shot. Allison's actions after the shooting in concealing the gun under the kitchen sink could be considered as an indi-

cation of his consciousness of guilt. *State v. Harris,* 602 S.W.2d 840, 846 (Mo.App. 1980).

In addition, the size difference between the two men was minimal. Although Biggins weighed thirty-five pounds more than Allison, Allison was four inches taller. Even if Biggins had been much larger than Allison, the Missouri Supreme Court found in *Chambers* that fear of size alone is not enough to justify the use of deadly force in self-defense. *Chambers,* 671 S.W.2d at 783.

The evidence was conflicting and disputed. Whether Allison had a right to self-defense was a question of fact for the jury, and the record contains sufficient evidence to support the jury's finding that Allison did not act in self-defense. Point I is denied.

In Point II, Allison argues that the trial court erred in submitting to the jury two paragraphs of the self-defense instruction regarding whether or not Allison was the initial aggressor because the evidence showed that Biggins started an argument, made threats, refused to leave Allison's house when ordered to do so, grabbed Allison by the throat and pushed Allison into a window. The trial court submitted to the jury Instruction No. 9 (MAI–CR 3d 306.06) which is the approved pattern Missouri instruction on self-defense. Allison claims that the second and third paragraphs of the instruction, which address the issue of whether Allison was the initial aggressor, should have been excluded because the evidence at trial showed Biggins to be the "initial aggressor."

The first three paragraphs of Instruction No. 9 read as follows:

One of the issues in this case is whether the use of force by the defendant against David Biggins was in self-defense. In this state, the use of force including the use of deadly force to protect oneself from harm is lawful in certain situations.

A person can lawfully use force to protect himself against an unlawful attack. However, an initial aggressor, that

is, one who first attacks or threatens to attack another, is not justified in using force to protect himself from the counter-attack which he provoked.

A person who is the initial aggressor in an encounter can regain the privilege of using force in lawful self-defense if he withdraws from the original encounter and clearly indicates to the other person his desire to end the encounter. Then, if the other person persists in continuing the incident by threatening to use or by using force, the first person is no longer the initial aggressor and he can then lawfully use force to protect himself. Paragraph 3(a) of the "Notes in Use" following § 306.06 indicates that the two paragraphs Allison challenges should be used only when there is evidence that the defendant was the initial aggressor and deleted when there is no evidence to indicate the defendant was the initial aggressor.

In the case at hand, the evidence showed that Allison left the porch where the argument with Biggins began, retrieved a loaded gun from the bedroom, and returned to confront Biggins, who was unarmed, in the dining room. If a party continues or renews an argument after having the opportunity to abandon it, that party becomes the aggressor, even though he or she was not at fault in initiating the original altercation. *State v. Bray*, 818 S.W.2d 291, 293 (Mo.App.1991). This court found in *Stinson* that evidence showing the appellant had deliberately acted to arm herself and to pursue the argument with her husband was sufficient for the jury to conclude that the appellant was the aggressor. *Stinson*, 714 S.W.2d at 841.

 Allison argues, however, that because he was in his own home he had no duty to retreat to avoid using deadly force. Under the common-law rule requiring a person to retreat, the necessity for killing is not deemed to exist so long as there is a safe avenue of escape from the attack. *State v. Isom*, 660 S.W.2d 739, 742 (Mo. App.1983). A person who is attacked in his own dwelling has a right to stand his ground rather than retreat, if this is neces-

sary to save his own life or to protect himself from serious physical harm. *State v. Neria*, 526 S.W.2d 396, 398 (Mo.App. 1975); *State v. McGowan*, 621 S.W.2d 557, 559 (Mo.App.1981). The issue in this case is whether the use of deadly force was necessary to save Allison from death or serious physical injury. There was sufficient evidence before the jury upon which it could have found that even though Biggins was arguing with Allison, Biggins had made no threats of attack nor attacked Allison before Allison obtained the weapon and used deadly force against Biggins. If Allison, even in his own home, left the location of the argument to obtain the weapon and then returned to renew the argument and utilize the weapon against Biggins when it was not reasonably necessary to do so, then Allison, not Biggins, would be the aggressor.

Upon contradictory evidence as to who was the initial aggressor, it was a question of fact and was properly submitted to the jury. The trial court did not err in submitting the initial aggressor paragraphs of the self-defense instruction to the jury, as it was required to do so. Point II is denied.

Allison argues in Point III that the court erred and abused its discretion in sustaining the State's objection during the direct examination of Allison regarding whether or not Allison believed Biggins was capable of doing him serious physical harm because the question was not leading and the evidence it sought was relevant. Allison was asked during direct examination the following question: "Did you at that time feel that Biggins in his state and with his build was capable of doing you serious physical harm?" Opposing counsel objected that the question was leading and the court sustained the objection. Allison's counsel rephrased the question and asked "What was going through your mind as you were firing?" Allison's answer included a description of his fear that Biggins would do him serious physical harm because of Biggins' angry state.

 Whether to allow leading questions in a criminal case is largely within the trial court's discretion, *Lewis v. State*, 767

S.W.2d 49, 53 (Mo.App.1989), and will not constitute reversible error unless there is an abuse of discretion and prejudice results. *State v. Thomson,* 705 S.W.2d 38, 40 (Mo.App.1985). A leading question is one which suggests the answer to the witness. Black's Law Dictionary 800 (5th ed. 1979). As the question asked of Allison suggested how he might have felt and could be answered by "yes" or "no," the trial court did not abuse its discretion in sustaining the objection. Additionally, Allison was not prejudiced by the trial court's ruling because the evidence the original question attempted to elicit was effectively entered into the record by counsel's rephrased question and Allison's answer. *State v. Urban,* 798 S.W.2d 507, 516 (Mo. App.1990). Point III is denied.

The judgment is affirmed.

All concur.