**STATE of Missouri, Respondent,**

v.

**Abbas ABDUL–KHALIQ, Appellant.**

No. WD 57748.

Missouri Court of Appeals, Western District.

March 20, 2001.

Jeremiah W. (Jay) Nixon, Attorney General, Jefferson City, Philip M. Koppe, Assistant Attorney General, Kansas City, for Respondent.

Douglas R. Hoff, Assistant Public Defender, St. Louis, for Appellant.

Before LAURA DENVIR STITH, P.J., and SMART and HOWARD, JJ.

HOWARD, Judge.

Abbas Abdul–Khaliq appeals from his convictions of two counts of murder in the first degree, § 565.020.1,[1] and two counts of armed criminal action, § 571.015.1. In his sole point on appeal, Abdul–Khaliq contends that the trial court erred when it refused to submit his two proposed self-defense instructions.

We affirm.

## Facts

On April 20, 1998, Abbas Abdul–Khaliq was charged with two counts of murder in the first degree and two counts of armed criminal action. The case was tried before a jury in the Circuit Court of Jackson County, Missouri. The evidence adduced at trial, viewed in the light most favorable to the verdicts, is as follows.

In 1997, Wally and Sulayman Loum, two brothers from West Gambia, Africa, came to live with Abbas Abdul–Khaliq at his home. Abdul–Khaliq's wife and mother also lived in the home. Abdul–Khaliq allowed the Loums to stay in his home so that they could care for his mother, who was suffering from emphysema. The Loum brothers, like Abdul–Khaliq and his wife, were practicing Muslims.

Over time, the Loums began arguing with Abdul–Khaliq about how he practiced his religion. Abdul–Khaliq grew tired of

---

1. All statutory references are to RSMo 1994.

their criticism and in early January 1998, he decided to ask the Loums to move out. It was agreed that they would move out at the end of January, when Ramadan was over.

On January 22, 1998, while the Loums were still living in his house, Abdul–Khaliq shot both men twice at close range with a 9-millimeter handgun. He tied their hands and feet together, wrapped their bodies in duct tape, curtains and a blue tarp, and drove to a bridge in Saline County, where he dumped the bodies over the railing of a bridge. When he returned home, Abdul–Khaliq cleaned up the blood from his vehicle and the carpets inside his home and removed a section of carpet from the top of the stairs where Sulayman had been shot. He also dismantled the 9-millimeter pistol he had used to shoot the two men and disposed of the barrel. He then threw away all of the victims' belongings to cover up the shootings.

Five days later, on January 27, 1998, the highway patrol found the bodies of the Loum brothers on the south bank of the Black Water River underneath the bridge. The bodies were wrapped in plastic curtain material and an electric blanket, which were secured by duct tape. The men's hands and feet were also secured with duct tape. Both men had large garment sacks tied around their heads. In one of the sacks there was a towel. A blue tarp was found nearby.

There were blood smears on the guardrail of the bridge and several droplets of blood just a few feet inside the bridge's surface. Troopers also noticed a skid mark on the bridge surface. There were tire tracks in the dirt in two other places. Troopers made casts of the tire marks and collected soil samples at the scene.

The troopers were able to identify the bodies as those of Wally and Sulayman Loum, and learned from family members that the brothers had last lived with Abdul–Khaliq.

Sergeant James Ripley and Sergeant Kyle Marquart of the Missouri Highway Patrol contacted Abdul–Khaliq and later met him at his home. Abdul–Khaliq told the troopers that the two men had been staying with him but had decided to leave. He said he did not know where the two men had gone, but said Wally had talked about going to Chicago or Washington, D.C. He also recalled that at one time they were talking about moving to Texas because they had a brother who lived there.

Abdul–Khaliq allowed the police to look through his house. In a closet in an upstairs bedroom, the officers observed a box containing a curtain that matched the curtain in which the bodies were wrapped. In the drawer of a table near the top of the stairs, they found a box of 9 millimeter bullets. They entered the bathroom and opened one of the drawers; inside was a towel that matched the towel that was wrapped around one of the victim's heads inside the garbage bag.

The troopers realized that Abdul–Khaliq may have been involved in the homicides. They then left Abdul–Khaliq's home and called police headquarters to request assistance. They also called the homicide unit of the Kansas City police department in order to obtain a warrant to search Abdul–Khaliq's home. While Sergeant Ripley was using the phone, Abdul–Khaliq drove up and asked the troopers what they were doing.

Kansas City police stopped Abdul–Khaliq's vehicle a short distance away. When Sergeant Ripley arrived at the scene of the stop, he examined the treads of Abdul–Khaliq's rear tires and observed that they shared the same characteristics as the tire tracks they had observed at the area where the bodies were found.

After obtaining a search warrant, police conducted a thorough search of Abdul–Khaliq's home. In the upstairs bedroom, they discovered a shotgun and a red nylon bag containing magazine clips and shotgun ammunition. In a closet in the bedroom, they recovered a blue shower curtain. In

an office area downstairs, they found a .22–caliber rifle. Inside an end table in the living room, they discovered a .38–caliber revolver.

They discovered that the basement had been used as a target range and was strewn with 150 spent 9–millimeter shell casings and approximately 120 9–millimeter bullets. In a trash can in the basement, under some newspapers, they found a disassembled 9–millimeter pistol and some ammunition. The barrel of the weapon was missing. Subsequent ballistics tests revealed that the shell casings had been fired from the disassembled 9–millimeter pistol found in the trash can. A ballistics expert concluded that the bullets found in the basement and the two bullets removed from the victims' bodies all had been fired from this weapon as well.

Luminol testing, which reveals the presence of blood, revealed the presence of blood stains in the kitchen, the stairway in the living room, and the landing at the top of the stairs. Luminol testing of Abdul–Khaliq's vehicle revealed signs of blood on the tie-down latch in the back of the vehicle and the back of a folded-down seat inside the station wagon.

On Tuesday, February 10, 1998, Sergeant Ripley interviewed Abdul–Khaliq at police headquarters. At that time Abdul–Khaliq neither admitted nor denied that he had been involved in the killings. He told the trooper that he had some things he wanted to take care of and he would come back on Friday, the 13th, and tell them what happened.

There were several discrepancies among the different versions of the story Abdul–Khaliq told police and that to which he testified at trial. What follows is the version to which Abdul–Khaliq testified at trial. Abdul–Khaliq said that after allowing the Loum brothers to stay at his house so they could take care of his sick mother, they continually argued over their manner of praying. When Abdul–Khaliq sought to speak to Sulayman about their disagreements, Wally stepped into the hallway with a gun, cursing Abdul–Khaliq and threatening to kill his family. Abdul–Khaliq said he feared that Wally was going to shoot him at that time.

Abdul–Khaliq decided that the best thing for him to do was to leave the house. Because he was afraid the Loums might kill his mother and his wife, he took them to stay at his friend Muhammed Amead's house. Abdul–Khaliq then returned to his home with Amead.

When Abdul–Khaliq and Amead returned to the house, Abdul–Khaliq was carrying a 9–millimeter pistol. Wally was standing in the kitchen making something to eat, with a gun tucked in his pants. The two started arguing again and Wally walked toward Abdul–Khaliq. Abdul–Khaliq pointed his gun at Wally and told him he needed to pack his things. Wally then turned and walked away toward the stove. Abdul–Khaliq started walking behind Wally, with his gun still pointed at Wally's head. Abdul–Khaliq then started lowering the gun. Wally spun around with the gun in his hand, and Abdul–Khaliq shot Wally twice.

After shooting Wally, Abdul–Khaliq ran to the foot of the stairs and saw Sulayman standing there. When Sulayman "lunged" toward him, Abdul–Khaliq shot him twice.

After the shootings, Abdul–Khaliq disposed of the bodies and got rid of the Loums' belongings.

Following trial, the jury convicted Abdul–Khaliq on all four charges. On September 16, 1999, the court sentenced Abdul–Khaliq to two terms of life imprisonment without the possibility of parole on the murder counts and two terms of thirty years imprisonment on the armed criminal action counts. This appeal follows.

### Standard of Review

"Instructions must be based upon substantial evidence and reasonable inferences drawn therefrom." *State v.*

*Wilhelm,* 774 S.W.2d 512, 517 (Mo.App. W.D.1989). "In determining whether sufficient evidence exists for an instruction, we view all facts and inferences in the light most favorable to the State, and all adverse inferences and evidence will be disregarded." *State v. Brigman,* 784 S.W.2d 217, 221 (Mo.App. W.D.1989). "We will only reverse for an instructional error if we find both error in submitting the instruction and that the error prejudiced the defendant." *State v. Clarkston,* 963 S.W.2d 705, 714 (Mo.App. W.D.1998).

■■■ In the present case, the matter of instructional error was included in the motion for new trial; however, only the instruction pertaining to Wally Loum was mentioned. Therefore, Abdul–Khaliq seeks plain error review as to the instruction pertaining to the shooting of Sulayman Loum. "Plain error review of instructional error is warranted where an error so substantially affects the rights of an accused that manifest injustice results if it is left uncorrected." *State v. McCoy,* 971 S.W.2d 861, 864 (Mo.App. W.D.1998). "For instructional error to rise to the level of plain error, the trial court must have so misdirected or failed to instruct the jury so that it is apparent that the instructional error affected the verdict." *State v. Deck,* 994 S.W.2d 527, 540 (Mo. banc), *cert. denied,* 528 U.S. 1009, 120 S.Ct. 508, 145 L.Ed.2d 393 (1999).

### Argument

Abdul–Khaliq's sole point on appeal is that the trial court erred when it refused to submit his two proposed self-defense instructions, which did not include the language requiring the jury to find that he was not the initial aggressor in the encounters with Sulayman and Wally Loum. Abdul–Khaliq argues that the Loum brothers were remaining unlawfully in his home after threatening to murder him and his family. Abdul–Khaliq argues that he was thus entitled to stand his ground and order the Loums out of his house and was not required to "withdraw" from the encoun-

ters and communicate that withdrawal to Sulayman and Wally Loum. Abdul–Khaliq claims that he was prejudiced by the trial court's error because the instructions that were submitted misled the jurors to believe that he had a duty to retreat, and thus destroyed his defense.

Instruction Number 7 provided, in relevant part, as follows:

One of the issues as to Count I is whether the use of force by the defendant against Wally Loum was in self-defense. In this state, the use of force including the use of deadly force to protect oneself from harm is lawful in certain situations.

A person can lawfully use force to protect himself against an unlawful attack. However, an initial aggressor, that is, one who first attacks or threatens to attack another, is not justified in using force to protect himself from the counter-attack which he provoked.

A person who is the initial aggressor in an encounter can regain the privilege of using force in lawful self-defense if he withdraws from the original encounter and clearly indicates to the other person his desire to end the encounter. Then, if the other person persists in continuing the incident by threatening to use or by using force, the first person is no longer the initial aggressor, and he can then lawfully use force to protect himself. . . .

On the issue of self-defense as to Count I, you are instructed as follows:

If the defendant was not the initial aggressor in the encounter with Wally Loum, or if he was the initial aggressor and clearly indicated to Wally Loum his withdrawal from the encounter, and if the defendant reasonably believed he was in imminent danger of death or serious physical injury from the acts of Wally Loum and he reasonably believed that the use of deadly force was necessary to defend himself, then he acted in lawful self-defense.

\* \* \* \* \*

Instruction Number 12, relating to Count III, involving Sulayman Loum, contains language identical to that in Instruction Number 7. The self-defense instructions proposed by Abdul–Khaliq did not contain the "initial aggressor" language that was included in the instructions proposed by the State.

■ Abdul–Khaliq contends that his initial action–ordering the Loums out of his home at gunpoint[2]—was justified by § 563.036.1. Section 563.036, which concerns use of force in defense of premises, provides, in relevant part, as follows:

1. A person in possession or control of premises or a person who is licensed or privileged to be thereon, may, subject to the provisions of subsection 2 of this section, use physical force upon another person when and to the extent that he reasonably believes it necessary to prevent or terminate what he reasonably believes to be the commission or attempted commission of the crime of trespass by the other person.

2. A person may use deadly force under circumstances described in subsection 1 of this section only:

(1) When such use of deadly force is authorized under other sections of this chapter; or

(2) When he reasonably believes it necessary to prevent what he reasonably believes to be an attempt by the trespasser to commit arson or burglary upon his dwelling; or

(3) When entry into the premises is made or attempted in a violent and tumultuous manner, surreptitiously, or by stealth, and he reasonably believes that the entry is attempted or made for the purpose of assaulting or offering physical violence to any person or being in the premises and he reasonably believes

that force is necessary to prevent the commission of a felony.

Abdul–Khaliq further argues that once he told the Loums that they had to leave and Wally responded by threatening to murder him and his family, their continued presence in his home was the crime of trespass under § 569.140. He further contends that because his actions were justified by his need to end the Loums' trespass in his home, he was not the "initial aggressor," and therefore he had no duty to withdraw from the encounter and allow the Loums to continue their unlawful presence in his home.

Abdul–Khaliq argues that in general, before responding with force to defend oneself, one has a duty to retreat from an attacker if it is safe to do so. A time-honored exception to this rule is that one who is attacked in his own home has the right to stand his ground and refuse to retreat, even if he can do so. Abdul–Khaliq contends that as instructed, the jury was precluded from finding that he acted in self-defense. He argues that the evidence was clear that he was armed and approached the Loums to order them out of his house—an act which the jury would likely consider to be an initial threat to attack them—so the jury was virtually certain to erroneously find that he was the "initial aggressor." It is equally clear, Abdul–Khaliq argues, that he did not flee after initiating the encounters with the Loums; instead he stood his ground as he contends he was entitled to do to remove the Loums from his home. Thus, the jury could not help but conclude that he had not "withdrawn" from his encounters with the Loums—as he was required to do by the instruction given to the jury—to regain the right of self-defense.

We initially note that Abdul–Khaliq's reliance on § 563.036.1 as justification for his action of ordering Wally Loum out of his home at gunpoint is misplaced. Section

---

**2.** Throughout his brief, Abdul–Khaliq contends that he ordered the Loums out of his home at gunpoint. However, the evidence

indicates that Abdul–Khaliq only initially ordered Wally Loum out of his home at gunpoint.

563.011(1) states that " '[d]eadly force' means physical force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious physical injury." *See also* MAI–CR3d 333.00. In the present case, the evidence shows that Abdul–Khaliq used deadly force by brandishing his gun in a threatening manner.[3] The State argues, and we agree, that § 563.036 makes it clear that a person may only use "physical force," not "deadly force" to eject a trespasser from his home under circumstances like the ones in the present case. Consequently, the State argues, when Abdul–Khaliq put a loaded pistol to Wally Loum's head and ordered him to leave, he became the "initial aggressor" and could not justify killing Loum on grounds of self-defense. The State further argues that since Abdul–Khaliq shot Sulayman Loum while Loum was standing at the top of the stairs, there was no dispute that Abdul–Khaliq was the "initial aggressor" in that confrontation.

We find that § 563.036.2, not § 563.036.1, is the proper section to consider in determining whether Abdul–Khaliq's actions were justified. It is clear that his actions were not justified under either § 563.036.2(2) or § 563.036.2(3). Therefore, the only way Abdul–Khaliq would have been justified in using deadly force is if deadly force was "authorized under other sections" of chapter 563.

Section 563.031, which concerns use of force in defense of persons, provides, in relevant part, as follows:

1. A person may, subject to the provisions of subsection 2 of this section, use physical force upon another person when and to the extent he reasonably believes such force to be necessary to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful force by such other person, unless:

(1) The actor was the initial aggressor; except that in such case his use of force is nevertheless justifiable provided

(a) He has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident by the use or threatened use of unlawful force; or

(b) He is a law enforcement officer and as such is an aggressor pursuant to section 563.046; or

(c) The aggressor is justified under some other provision of this chapter or other provision of law. . . .

2. A person may not use deadly force upon another person under the circumstances specified in subsection 1 of this section unless he reasonably believes that such deadly force is necessary to protect himself or another against death, serious physical injury, rape, sodomy or kidnapping or serious physical injury through robbery, burglary or arson.

Note on Use 3(a) to MAI–CR3d 306.06 provides that "[i]f there is no evidence indicating the defendant was the initial aggressor or provoked the incident," then the initial aggressor language of the instruction "will not be used." The note further provides that "[i]f there is evidence the defendant was the initial aggressor," then the initial aggressor language "will be used (unless, as indicated in the next paragraph, it is clear that the defendant was justified in being the initial aggressor)." The note then cites § 563.031.1(1)(b) and

---

**3.** In *State v. Parkhurst*, 845 S.W.2d 31, 36 (Mo. banc 1992), the court addressed the issue of whether exhibiting a pistol in an angry and threatening manner should be characterized as physical force or deadly force. The court held as follows:

Unquestionably, the risk of death or serious physical harm is significantly elevated when one of the parties to an angry confrontation displays a handgun. Implicit in the statute forbidding the brandishing of weapons in an angry or threatening manner is a legislative determination that such conduct creates a substantial risk of death or physical injury to those in whose presence such conduct occurs.

(c), which list instances where a person is justified in being the initial aggressor.

■ When there is contradictory evidence as to who was the initial aggressor, that issue is a question of fact and is properly submitted to the jury. *State v. Allison*, 845 S.W.2d 642, 647 (Mo.App. W.D.1992). In such cases, the trial court does not err in submitting the initial aggressor paragraphs of the self-defense instruction to the jury, and in fact it is required to do so. *Id.*

The State argues that even if the statute had allowed Abdul–Khaliq to use deadly force to eject the Loums from his home, the jury was not required to believe Abdul–Khaliq's version of events. Based upon Abdul–Khaliq's conduct in disposing of the bodies and denying his involvement to the police, the State argues, the jury could have reasonably concluded that Abdul–Khaliq's version of the events was untrue, and that Abdul–Khaliq had been the aggressor in the confrontation that resulted in the Loums' deaths.

■ We find that at the very least, there was a factual dispute as to whether Abdul–Khaliq was the initial aggressor in this case. Abdul–Khaliq's behavior after the Loums were killed is evidence of his consciousness of guilt. *See Denson v. State*, 31 S.W.3d 166, 179 (Mo.App. W.D. 2000). Abdul–Khaliq admitted that after he killed the Loums, he did not contact the police, but instead decided to hide the bodies. He tied their hands and feet together, wrapped their bodies in duct tape, curtains and a tarp, and dumped the bodies over the railing of a bridge near Black Water River. When he returned home, Abdul–Khaliq cleaned up the blood from his vehicle and the carpets of his home and removed a section of carpet from the top of the stairs where Sulayman had been shot. He also dismantled the gun he had used to shoot the Loums and disposed of the barrel. He then threw away all of the Loums' belongings to cover up the shootings. Abdul–Khaliq also lied to the police, telling them that the Loums had been staying with him, but had decided to leave, and he did not know where they had gone. It was only after Abdul–Khaliq was confronted with the evidence linking him with the killings that he admitted that he killed the Loums in self-defense. This behavior by Abdul–Khaliq would support the reasonable inference that he was guilty of attacking the Loums, and is contrary to Abdul–Khaliq's version of the facts that he was not the initial aggressor. *See Denson*, 31 S.W.3d at 180.

■ Abdul–Khaliq correctly states that "[a] person who is attacked in his own dwelling has a right to stand his ground rather than retreat, if this is necessary to save his own life or to protect himself from serious physical harm." *Allison*, 845 S.W.2d at 647. However, even if Abdul–Khaliq was in his own home, if he left the location of the argument to obtain a weapon and returned to renew the argument and utilize the weapon against the Loums when it was not reasonably necessary to do so, then Abdul–Khaliq would be the aggressor. *Id.*

We find that there was sufficient evidence to support the submission of the initial aggressor paragraphs in the instructions, and the trial court did not commit error, plain or otherwise, in refusing to submit Abdul–Khaliq's self-defense instructions to the jury.

The judgment of the trial court is affirmed.

LAURA DENVIR STITH, P.J., and SMART, J., concur.