STATE of Missouri, Respondent,

v.

Vince C. FRAZIER, Appellant.

No. WD 74915.

Missouri Court of Appeals,
Western District.

July 30, 2013.

Chris Koster, Attorney General, Gregory L. Barnes, Assistant Attorney General, Jefferson City, MO, for Respondent.

Susan L. Hogan, Appellate Defender, Kansas City, MO, for Appellant.

Before Division Two: THOMAS H. NEWTON, Presiding Judge, and KAREN KING MITCHELL and GARY D. WITT, Judges.

KAREN KING MITCHELL, Judge.

Vince C. Frazier appeals his conviction, following a jury trial, of first-degree murder pursuant to section 565.020.[1] Frazier was sentenced by the court to life in prison without parole.[2] Frazier argues that the trial court erred in denying his motion for judgment of acquittal, accepting the jury's verdict of first-degree murder, and sentencing him, in that the evidence was insufficient to establish that he deliberated before causing the victim's death. Frazier claims that because he was suffering from a mental disease or defect resulting in diminished capacity, he was unable to deliberate at the time of the murder. Because there is sufficient evidence of deliberation, we affirm.

**Factual and Procedural Background**[3]

In 2004, Frazier was dating the victim, Sharrae Bowden, and on July 24, 2004, a child (Son) was born of the relationship.

---

**1.** All statutory references are to Missouri Revised Statutes 2000, as updated through the 2005 Cumulative Supplement, unless otherwise noted.

**2.** Frazier was also convicted of armed criminal action, under section 571.015, and sentenced to a consecutive prison term of sixteen years. Frazier does not appeal the armed criminal action conviction and sentence.

**3.** We view the evidence in the light most favorable to the verdict. *State v. Strong*, 142 S.W.3d 702, 717 (Mo. banc 2004).

By June 2005, the relationship had become strained and the couple argued frequently. In late June or early July, Bowden began dating another man and indicated to her mother that she no longer wished to have a relationship with Frazier. Frazier and Bowden nevertheless continued to speak on a regular basis, as they both cared for Son.

On July 13, 2005, Bowden went on a date with her new boyfriend. Frazier, who lived at his mother's house located at 1202 East 59th Street, was home taking care of Son. At 8:00 p.m., Frazier started calling Bowden's mother's house, where Bowden lived, to ask if Bowden was home. Bowden did not return home that night. Frazier continued to call the house every hour until the next morning. Bowden's mother, who testified that Frazier "sounded concerned like something was wrong," stopped answering the calls at midnight, but started answering again around 2:00 a.m. Just before 7:00 a.m., when Frazier called, in addition to asking if Bowden's mother had heard from Bowden, Frazier indicated that Son needed milk. Bowden's mother offered to bring milk to Frazier's house, but he asked if Bowden could bring it over instead. Bowden's mother told Frazier that if Bowden returned home, she would send her over with Son's milk. When Bowden did not return home, Bowden's mother brought the milk to Frazier.

When Bowden's mother arrived at Frazier's residence, Frazier came running angrily down the stairs toward her, but when he realized that she was not Bowden, Frazier "went from being angry to being humble." When Bowden's mother asked where Son was, Frazier said that Son was gone with Frazier's mother. Because Frazier was angry when she arrived, Bowden's mother asked if he was all right, and after receiving reassurance that he was, she left. As she was driving home around 8:30 a.m., Bowden's mother saw Bowden waiting at a bus stop. She picked Bowden up and drove her to work. When Bowden's mother told Bowden about the previous night and Frazier's request for milk, Bowden told her that Son had plenty of milk at Frazier's house and that Frazier's request was merely an excuse to get Bowden to come over and talk to him.

After Bowden finished her work shift on July 14, 2005, she went to Frazier's house to pick up Son. At approximately 6:15 that evening, Frazier's neighbor, Betty Hill, heard screams for help. When she walked toward the screaming, she saw Bowden's body lying on the ground with her face and chest covered in blood, while a young man wearing a white t-shirt kneeled over Bowden, holding what Hill believed to be a knife. At the same time, another neighbor, Charlie Adams, also heard a young woman screaming. When he went to investigate, he also observed Bowden lying on the ground and a young man wearing a white t-shirt kneeling over her with a knife.[4] Both Hill and Adams yelled at the young man, and he ran into Frazier's mother's home next door. Adams went to the house, pounded on the front door, and told the person who answered that the young man who just ran into the house had stabbed a young girl behind the vacant house next door.[5] Adams saw the same young man come out of the house and run

---

4. During his testimony, Adams moved his hand in an up-and-down motion to demonstrate what he observed the young man doing when he saw him over Bowden with a knife in his hand. The police were unable to locate the knife used in the murder.

5. Bowden's body was found partially in the yard of the vacant property at 1200 East 59th Street, with her legs draped over a fence on the property line between the vacant property and Frazier's house.

off down the street; he had changed out of his white t-shirt and was wearing a red, grey, and black jersey. Adams also found Son, unharmed, sitting in the driveway three or four steps away from Bowden. Bowden was unresponsive when the police arrived, and paramedics confirmed that she was dead.

Bowden suffered six blunt-force injuries, seven stab wounds, and eight incised wounds.[6] She died from multiple sharp-force injuries. Bowden did not die immediately; it could have taken up to forty-five minutes for her to die. The medical examiner testified that any one of Bowden's stab wounds, if left untreated, could have caused her death. Bowden also suffered injuries consistent with wounds incurred while defending herself from her attacker.

At the murder scene, a few feet from Bowden's body, officers found a hole, measuring approximately four feet long, one-and-a-half feet wide, and six inches deep, that appeared to have been recently dug. Near Bowden's body, the police also found a machete, a snow shovel, a rake, a putty knife, and a pair of latex gloves that were covered in dirt and Bowden's blood. The police found a second pair of latex gloves near a tree, a third pair near the hole, and a fourth pair near the fence; all of these gloves had dirt on them.

In Frazier's mother's house, the police found blood on the interior and exterior door knobs of a side door, as well as in the upstairs bathroom sink. The police recovered two bloodstained white t-shirts,[7] an open box of latex gloves, a torn photograph of Son, and Frazier's driver's license in an upstairs bedroom at his mother's house. Frazier was arrested on July 16, 2005, after the police found him hiding under a bed at an apartment complex in the area of 80th Street and Troost Avenue. The police discovered Bowden's blood on Frazier's shoes when he was arrested.

The arresting officer testified that Frazier did not have any trouble understanding him or communicating with him when he was taken into custody. Frazier was interviewed by police approximately eight or nine hours after his arrest. The interviewing officer testified that Frazier was polite, gave appropriate answers, did not appear to be suffering from any hallucinations, and did not have any difficulty answering questions or providing information related to his address, family, educational background, or work history.

During his interview, Frazier provided police with two different versions of the events that took place on July 14, 2005. In a videotaped interview, Frazier first told police that Bowden came to his house on July 14, 2005, and that he was in the backyard with Son when she arrived. Frazier said they got into a fight and she pulled out a knife; he claimed that, as he tried to take the knife from her, she was stabbed in her right side when they fell to the ground. After the interviewing officer confronted Frazier with the inconsistencies between his version of events and the physical evidence and witness accounts, Frazier changed his story. Frazier then said Bowden pulled out the knife and that he took it from her and stabbed her once; she then fell to the ground and wrestled the knife away from him. After changing his story, Frazier told the officer he was saying only what the officer wanted to

---

6. Both stab wounds and incised wounds are caused by a knife or other sharp object. A stab wound is deeper than it is long, and an incised wound is longer than it is deep.

7. The white t-shirts were recovered with one overlaying the other, indicating they had been worn together. The outer t-shirt had blood stains everywhere except for a small area under the left arm.

hear and that the first version of events was the truth. Frazier refused to make a videotaped statement of his second version of events. Frazier admitted that he dug the hole near Bowden's body,[8] and told the officer that the tools and gloves found at the scene came from his mother's house.

After his arrest, Frazier remained at the Jackson County Detention Center until he was admitted to Fulton State Hospital (FSH).[9] At the request of Frazier's attorney, Frazier was given an initial mental health evaluation in October 2006, and the examiner concluded that Frazier was both incompetent to stand trial and in need of treatment at a state facility. In January 2007, the State requested its own evaluation of Frazier. The report following the January 2007 evaluation indicated that Frazier exhibited some psychotic behaviors, but it also noted that inconsistencies in his behavior suggested fabrication and/or exaggeration of symptoms, and the examiners recommended that Frazier be admitted to FSH. Frazier was admitted in February 2007. He was discharged with medication in March 2009, but later returned to FSH in June 2010.

Dr. Bill Geis, psychologist and Director of Behavior Health Research at the UMKC School of Medicine, testified for the defense. Dr. Geis evaluated Frazier in 2009 to provide a second opinion on Frazier's competency, after another psychologist had determined that Frazier's competence had been restored.

Dr. Geis met with Frazier on September 9, October 16, and October 20, 2009, at the Jackson County Detention Center. He testified that, although Frazier was taking anti-psychotic and anti-depressant medication, he remained disorganized, his thoughts were rapid and tangential, his speech was accelerated, his hygiene was poor, he was very fearful of his surroundings, and he was having visual and auditory hallucinations. Dr. Geis also noted that Frazier had borderline intellectual functioning. Dr. Geis looked for signs of fabrication and exaggeration but ultimately concluded that Frazier was neither fabricating nor exaggerating his symptoms and that he had lost competence. Dr. Geis diagnosed Frazier with psychotic disorder NOS (not otherwise specified, a catch-all for different types of psychoses). Frazier was readmitted to FSH in June 2010, where he remained until his trial in December 2011.

In February 2011, Dr. Geis met with Frazier again to provide a second opinion after Frazier was deemed competent to stand trial. Dr. Geis agreed that Frazier was competent to stand trial and modified Frazier's diagnosis to schizoaffective disorder[10] mixed with depression, hypomania, and paranoia. Dr. Geis did not speak with Frazier about his mental state around the time of the murder until October 2011.

Frazier told Dr. Geis that he did not remember anything that happened around the time of Bowden's murder. After reviewing police records and interviewing Frazier's mother, brother, and current girlfriend, Dr. Geis concluded that there was a "strong possibility" Frazier was suffering from a psychotic episode on the day

8. Although he admitted to digging the hole, Frazier said he did not dig the hole for the purpose of placing Bowden's body in it.

9. Fulton State Hospital is a public mental health facility located in Fulton, Missouri. The hospital provides, among other services, forensic evaluations and admissions.

10. Dr. Geis testified that schizoaffective disorder is "schizophrenia with some bipolar mania mixed in or what we would call hypomania."

of the murder. Dr. Geis's opinion relied heavily on information provided by Frazier's mother and brother, particularly their account of a fight between Frazier and his brother that occurred within a month of the crime. Dr. Geis noted that Frazier's state of mind on the day of the murder was very vulnerable, that he was operating with diminished capacity, and that he "transiently and temporarily lost reality" and, therefore, could not deliberate before committing the murder. Dr. Geis did not consider the evidence that Frazier attempted to hide from police relevant to his determination, but he did concede that facts demonstrating that Frazier had engaged in any planning and was angry with the victim before the crime would be relevant to the issue of deliberation. Dr. Geis also acknowledged the possibility that Frazier's mental illness may not have affected his ability to deliberate.

Two experts testified for the State. Katie Klick, a clinical social worker and team leader at FSH, testified that, during both of Frazier's stays at FSH, she acted as his case manager, social worker, and the team leader of his ward. Klick had daily contact with Frazier, sometimes several times throughout the day, and she sometimes observed him without his knowledge. Klick testified that, while at FSH, Frazier developed relationships and made friends. In her work, Klick observed patients suffering from schizophrenia, and she testified that Frazier did not exhibit any of the behaviors or symptoms common to that mental illness. Klick acknowledged that Frazier's records indicated that he heard voices and saw objects that were not there, but she said that all of these symptoms were self-reported, and she never personally observed Frazier hallucinate, hear voices, talk to someone who was not there, or stare off into the distance. Klick noted that Frazier sometimes demonstrated aggressive and manipulative behavior and

that this behavior generally resulted from restrictions being placed on Frazier by the hospital staff.

Dr. Kline, a psychologist and forensic examiner at FSH, also testified for the State. Dr. Kline first evaluated Frazier in July 2007. Dr. Kline diagnosed Frazier as malingering, meaning that he was intentionally fabricating his symptoms of mental illness. Dr. Kline also noted that Frazier had mild signs of major depressive disorder and borderline intellectual functioning. Dr. Kline testified that it was not unusual for a defendant facing a first-degree murder charge to suffer from depression. Dr. Kline did not observe any signs that Frazier suffered from hallucinations, that he heard voices, or that he was responding to unseen stimuli.

In November 2010, Dr. Kline diagnosed Frazier with major depressive disorder, recurrent, in full remission, and borderline intellectual functioning, but he did not diagnose Frazier with malingering at that time. Dr. Kline acknowledged that Frazier had been prescribed anti-psychotic medication and explained that patients are often given this type of medication when they are initially examined, and they remain on the medication until they can be fully diagnosed. He also noted that Frazier took a low dosage of anti-psychotics and that the type of medication he took had uses other than treating psychosis, such as treating agitation, aggression, or sleep issues.

In November 2011, Dr. Kline evaluated Frazier with the specific purpose of discerning his mental state on the day of the murder. Frazier told Dr. Kline that he did not remember the day of the murder. (Dr. Kline indicated that it was not unusual for a defendant to make this kind of statement to an examiner.) Frazier also said, however, that he did not remember

where he went to school or if he even attended high school, or where he was living and who he was living with at the time of the murder. Dr. Kline testified that this type of unusual memory loss, related to Frazier's schooling and residence, was not consistent with any diagnoses Frazier had received, including borderline intellectual functioning. Dr. Kline reviewed Frazier's jail records and all the information from as close to the day of the murder as possible, noting that these kinds of records contained the most detail related to a person's functioning and behavior during that time frame.

Frazier's jail records did not indicate that he had any sort of disorientation or noticeable impairment when he was taken into custody. Dr. Kline noted that, when Frazier was interviewed by the police after his arrest, he tried to minimize his interactions and described a version of events that was plausible but inconsistent with the forensic evidence. Dr. Kline did not observe any sign that suggested Frazier's thoughts were disorganized. Dr. Kline noted that the reports of Frazier's behavior after the murder, including disposing of bloody clothing, changing into clean clothing, and running from the scene were significant, as they indicated that his thinking was organized and that he was not confused. Dr. Kline did not believe that a report of a fight between Frazier and his brother, or his mother and brother's reports of odd behavior, were significant to his findings.

Ultimately, Dr. Kline concluded that Frazier was not suffering from any major disorder or mental disease or defect on the day of Bowden's murder that would have affected his ability to deliberate. Dr. Kline further concluded that Frazier's borderline intellectual functioning did not have any impact on his behavior. Dr. Kline did not see any evidence that Frazier was suffering from depression, schizophrenia, or schizoaffective disorder on the day of the murder.

After denying Frazier's motion for judgment of acquittal, the court instructed the jury on first-degree murder, second-degree murder, armed criminal action, and the defense of diminished capacity.[11] The jury found Frazier guilty of first-degree murder and armed criminal action. The trial court sentenced Frazier to consecutive terms of life without parole for first-degree murder and sixteen years for armed criminal action. Frazier now appeals the first-degree murder conviction.

### Standard of Review

In reviewing a challenge to the sufficiency of the evidence, we must determine "whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Letica*, 356 S.W.3d 157, 166 (Mo. banc 2011). "The evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and in-

---

11. Instruction No. 6 provided the following with regard to diminished capacity:

You may consider evidence that the defendant had or did not have a mental disease or defect in determining whether the defendant had the state of mind required to be guilty of murder in the first degree.

The term "mental disease or defect" means any mental abnormality regardless of its medical label, origin, or source. However, it does not include an abnormali-

ty manifested only by repeated antisocial conduct.

If, after considering all of the evidence, including evidence that the defendant did or did not have a mental disease or defect, you have a reasonable doubt as to whether the defendant deliberated before acting, you must find the defendant not guilty of murder in the first degree as submitted in Instruction No. 5.

ferences contrary to the verdict." *State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005). "The credibility and weight of testimony are for the fact-finder to determine." *State v. Crawford*, 68 S.W.3d 406, 408 (Mo. banc 2002). "The fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances[,] and other testimony in the case." *Id.* We do "not act as a 'super juror' with veto powers"; instead, we give "great deference to the trier of fact." *State v. Miller*, 372 S.W.3d 455, 463 (Mo. banc 2012).

### Analysis

■ Frazier raises one point on appeal. He argues that the trial court erred . in denying his motion for judgment of acquittal because the State's evidence did not establish that he deliberated during the events that resulted in Bowden's death. Frazier does not deny that he stabbed Bowden and caused her death; instead, he argues that he was unable to deliberate at the time of the murder because he was suffering from a mental disease or defect. Frazier asserts that, at most, the State's evidence established that he committed second-degree murder insofar as he caused Bowden's death and knew or was aware that his conduct was practically certain to cause her death.

**I. The evidence was sufficient for a rational juror to find beyond a reasonable doubt that Frazier deliberated before causing Bowden's death.**

■ A person commits first-degree murder when he "knowingly causes the death of another person after deliberation upon the matter." § 565.020.1. Deliberation is defined as "cool reflection for any length of time no matter how brief." § 565.002(3). Thus, "[d]eliberation need be only momentary." *State v. Attwood*, 294 S.W.3d 144, 145 (Mo.App.S.D.2009).

"The requirement of proof of deliberation 'sets first degree murder apart from all other forms of homicide.'" *State v. Strong*, 142 S.W.3d 702, 717 (Mo. banc 2004) (quoting *State v. O'Brien*, 857 S.W.2d 212, 217–18 (Mo. banc 1993)). Without a showing of deliberation, intentional homicide is second-degree murder. *Id.* "Deliberation is normally proved by indirect evidence and inferences drawn from circumstances surrounding the murder." *State v. Stacy*, 913 S.W.2d 384, 386 (Mo.App.W.D.1996); *see also State v. Johnston*, 957 S.W.2d 734, 747 (Mo. banc 1997).

Evidence of multiple stab wounds, repeated blows, the failure to seek medical help, a prolonged struggle, ample opportunity to stop the attack, or that the defendant brooded over his actions before taking them can support an inference of deliberation. *Strong*, 142 S.W.3d at 717; *State v. Ervin*, 979 S.W.2d 149, 159 (Mo. banc 1998); *Johnston*, 957 S.W.2d at 747–48; *Stacy*, 913 S.W.2d at 386. A murder that required time to complete because of the defendant's chosen method of attack "has permitted an inference of deliberation." *Johnston*, 957 S.W.2d at 747 (quoting *O'Brien*, 857 S.W.2d at 218–19). Additionally, "[e]ven the short amount of time required for the defendant to approach the victim before stabbing her supports the reasonable inference that [he] reflected for at least the time required to reach the victim." *Stacy*, 913 S.W.2d at 386.

Here, the evidence showed that, before the attack, Frazier dug a shallow grave-like hole a few feet from the scene of the murder. The latex gloves and other tools apparently used in this endeavor all came from Frazier's mother's house, where Frazier lived. The evidence also supports the conclusion that Frazier called Bowden's house looking for her every hour the night before she was killed, and Frazier attempt-

ed to lure Bowden to her death by asking Bowden's mother to send Bowden over under the false premise that Son needed milk. Once Bowden arrived, Frazier lured her from the front porch to the backyard where, despite her multiple screams for help, he repeatedly attacked her, causing six blunt-force injuries, seven stab wounds, and eight incised wounds. The evidence indicated that Bowden suffered defensive wounds, as well, suggesting a prolonged fight. After fleeing, Frazier did not seek medical attention for Bowden, and she did not die immediately from her injuries. This evidence, and the reasonable inferences derived therefrom, was sufficient for a rational juror to find beyond a reasonable doubt that Frazier deliberated before causing Bowden's death.

## II. The jury rejected Frazier's defense of diminished capacity.

■ Frazier argues that, despite the State's evidence supporting deliberation, it was insufficient to sustain a first-degree murder conviction because of his evidence demonstrating that he suffered from a mental disease or defect, making him unable to deliberate at the time of the murder. Frazier's argument amounts to nothing more than a plea for this Court to ignore our standard of review and instead view the evidence in a light most favorable to Frazier's defense. We decline Frazier's request.

■ In his briefing, Frazier characterizes diminished capacity as a "special negative defense." A "special negative defense" is a defense "upon which the defendant has the burden of injecting the issue (the burden of producing evidence), but the state has the burden of persuasion." MAI–CR 3d 304.11. Once a defendant carries his burden of injecting the issue for a special negative defense, the State then bears the burden of disproving the existence of that defense

through either a separate paragraph or a cross-reference in the verdict-director. *State v. Davis*, 71 S.W.3d 659, 665 (Mo. App.W.D.2002); *see also* MAI–CR 3d 304.11 Charts. Thus, if Frazier's characterization were correct, he would have had the burden of producing evidence, and the State would have had the additional burden of *disproving* that Frazier was operating with a diminished capacity at the time of the murder.

■ "Inherent in the concept of the special negative defense is the idea that the act charged was committed, but by reason of the defense, it did not possess the qualities of criminality." *State v. Quisenberry*, 639 S.W.2d 579, 583 n. 8 (Mo. banc 1982). While evidence of a mental disease or defect is admissible in a criminal trial to demonstrate diminished capacity, § 552.015.2(8), "it is a negative or negating defense because the defendant has no burden to present evidence or to persuade." *State v. Walkup*, 220 S.W.3d 748, 755 (Mo. banc 2007). "[T]his 'defense' ... does not alter the elements to be proved by the state." MAI–CR 3d 304.11. It " 'is simply evidence that the defendant did not have the culpable mental state that is an essential element of the crime,' " and it "does not exclude a defendant's criminal responsibility." *Id.* at 755, 756 (quoting MAI–CR 3d 308.03, Notes on Use 3). Thus, contrary to Frazier's characterization, diminished capacity is not a special negative defense. "Rather, evidence of diminished capacity, *if believed by the jury*, would make the defendant responsible for the crime he actually committed; for example, second[-]degree murder instead of first[-]degree murder." *Id.* at 756 (emphasis added).

■ Therefore, although evidence of diminished capacity has the potential to negate the required element of a culpable

mental state, it is solely for the jury to determine, after considering all of the evidence, "whether that mental disease or defect prevented the defendant from forming the requisite mental state [of deliberation] at the time of the offense." *Nicklasson v. State,* 105 S.W.3d 482, 485 (Mo. banc 2003).

In the present case, both parties presented expert testimony on the issue of whether Frazier suffered from a mental disease or defect rendering him unable to deliberate at the time of the murder, and the court instructed the jury on the defense of diminished capacity. It was the jury's responsibility to determine the weight and credibility of all testimony, including the expert testimony, and it was within the jury's exclusive province to "'accept or reject all, some[,] or none of the testimony of any witness.'" *State v. Hayes,* 88 S.W.3d 47, 58 (Mo.App.W.D. 2002) (quoting *State v. Allison,* 845 S.W.2d 642, 645 (Mo.App.W.D.1992)); *see also State v. Butler,* 24 S.W.3d 21, 33 (Mo.App. W.D.2000). Here, the jury rejected evidence supporting Frazier's defense of diminished capacity, and we defer to that finding. *See In re the Care and Treatment of O'Hara,* 331 S.W.3d 319, 320 (Mo. App.S.D.2011) (holding that it is the jury's responsibility to weigh and evaluate competing expert witness testimony). Moreover, the evidence presented was more than sufficient to support a finding of deliberation. Thus, Frazier's conviction of first-degree murder is affirmed.

Point denied.

## Conclusion

The trial court committed no error in denying Frazier's motion for judgment of acquittal. There was sufficient evidence to support a conviction of first-degree murder. The judgment is affirmed.

THOMAS H. NEWTON, Presiding Judge, and GARY D. WITT, Judge, concur.