STATE of Missouri, Plaintiff–
Respondent,

v.

Samuel WEICHT, Defendant–
Appellant.

No. 23155.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 16, 2000.

ment of facts, we need not expound on other briefing shortcomings.

Emmett D. Queener, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Catherine Chatman, Office of Atty. Gen., Jefferson City, for respondent.

KENNETH W. SHRUM, Judge.

A jury convicted Samuel Weicht (Defendant) of burglary in the first degree, § 569.160, RSMo 1994.[1] The trial court sentenced Defendant to ten years in the Department of Corrections per the jury's recommendation. Defendant's appeal presents three questions:

First, is there sufficient evidence to support Defendant's conviction? We answer, "Yes."

Second, did the trial court err when it overruled Defendant's motion to suppress his statements and admitted them at trial over his objections? We answer, "No."

Third, does Defendant's claim of "plain error," on its face, establish substantial grounds for believing that manifest injustice or miscarriage of justice will result if we do not exercise our discretion to review for plain error? We answer, "No."

We affirm.

FACTS

Robert D. Cullers ("Robert") owned real estate in McDonald County where his son Jeffrey Cullers ("Jeffrey") lived until the summer of 1998. By September 1998, Jeffrey had moved out and was staying in Neosho. Even so, Jeffrey left most of his possessions in the house and checked on the house once or twice a week.

On September 14, 1998, Jeffrey checked on the house. He found some of his larger possessions missing, i.e., television, video-cassette recorder, and air conditioner. Other possessions were scattered about the house, including items stacked near a door as if someone was preparing to remove them. That night, after unsuccess-

fully watching for the perpetrator to return, Jeffrey told his father (Robert) the items had been stolen from the house.

The next morning, Robert drove toward his house to see what had happened. As he approached, he saw a car parked on the road about one hundred and fifty feet from the house. Upon entering the house, Robert saw Defendant hiding behind a chair. He immediately left the house and began planning how to "catch him." First, he checked Defendant's car, but found no keys therein. Later, Defendant came out of the house, but ran off and hid when Robert pursued him. Thereon, Robert attempted to disable Defendant's car by slicing two tires on the car. Next, Robert went to a neighbor's house to call the sheriff's office.

As Robert drove back toward his house, he saw Defendant fleeing in his car despite the two flat tires. Robert pursued Defendant until both approached highway patrolmen, who were working a traffic stop on a nearby highway. Both Defendant and Robert pulled over behind the patrol car and started toward each other, "yelling and screaming." After they were separated, Robert told officer Prewitt about finding Defendant in his house. Defendant told the other officer, J.W. Krehbiel, he was in the area "looking for walnuts" when Robert slashed his tires, chased him, and crashed his truck into Defendant's car.

Ultimately, Defendant was arrested for the burglary at Robert's house. After his arrest, Defendant gave several statements to law enforcement personnel regarding this incident. Defendant's first statement was to Robert Wormington, narcotics agent with the Southwest Missouri Drug Task Force.[2] In it, Defendant wrote of his efforts to buy drugs. He said that on September 14, 1998, he wanted to "trade for $1000 of meth with Lucy Palmer." Ac-

---

1. All statutory references are to RSMo 1994, unless otherwise indicated.

2. As explained in more detail later in this opinion, Defendant had previously signed a

contract with Wormington to act as a confidential informant regarding drug-related activity. After his arrest on burglary charges, Defendant asked to speak with Wormington.

cordingly, Defendant went to the "same spot" where he and Palmer usually met to do their drug business. While at that location, "some guy ran me off the road, slicing my tires."

Defendant gave his second and third statements to law enforcement personnel on September 21, 1998. In his second statement, Defendant told deputy sheriff McEntire he had gone "close to the Cullers['] residence" to make a drug deal with Palmer. Upon arriving, he saw Palmer and another person loading things from the house into the car. Palmer told Defendant they needed to leave, and she and her companion left. Thereon, Defendant heard a noise inside the Cullers' house and walked in to investigate. As he stood at the back door, an "old man showed up." Defendant ran to the barn and watched as the "old man" cut Defendant's car tires.

After Defendant wrote the above, McEntire told Defendant this was "a completely different story," and he "didn't believe the statement he had provided." At that point, Defendant grabbed the statement from McEntire and tore it up, saying he had lied but should have told the truth. McEntire asked Defendant if by tearing up the second written statement he "intended to invoke his rights and not speak with [McEntire] any longer." According to McEntire, Defendant answered, "No." Defendant then gave McEntire another statement.

In his third statement, Defendant told McEntire he went to Robert's house "to make a dope deal with Lucy Palmer, and . . . when he . . . arrived, they decided to clean the house out." After loading Palmer's car, she and another individual left, telling Defendant they would "be back in half an hour to make the dope deal with him." As Defendant was preparing to take items from the house to his car, he saw Robert come onto the scene.

Defendant attempted to have all of his statements kept from the jury, first by pre-trial motion to suppress and second, by timely objection at trial. In his motion to suppress, Defendant complained he was not "properly advised of his constitutional rights [per] *Miranda v. Arizona,*" his statements "were not voluntary and were a result of mental or physical coercion and duress and threat," and the statements "were obtained by trick, promises, and false pretenses." The trial judge overruled the motion to suppress and Defendant's objections at trial.[3]

When required, additional facts are given as we discuss Defendant's points relied on.

## DISCUSSION AND DECISION

### *Point I: Sufficiency of Evidence*

Defendant's first point relied on urges reversal on the theory there was insufficient evidence to support his conviction. The basis for this argument is that the information and verdict-directing instruction described the burglarized house as owned by Jeffrey, whereas the evidence clearly showed the subject house was owned by Robert.[4] Specifically, Robert testified Jeffrey had only lived in the house, and described the house to the highway patrol as "my house." Jeffrey testified he was only "in possession of this property where this incident occurred." Defendant insists his conviction must be reversed as there was no evidentiary support for one proposition hypothesized in the verdict-directing instruction, i.e., that Jeffrey owned the house in question.

---

3. In *Miranda v. Arizona,* the U.S. Supreme Court set out what have come to be known as "the *Miranda* warnings" as a "procedural safeguard" designed to protect an individual's privilege against self-incrimination. 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1630[66,67], 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966).

4. In part, the verdict-directing instruction hypothesized "the defendant knowingly entered unlawfully an inhabitable structure located at County Road D–76 one-half mile east of Rt. D and owned by Jeffrey Cullers . . . ."

When reviewing claims regarding the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, accepting as true all of the state's evidence, giving the state the benefit of all inferences from it, and disregarding all evidence and inferences contrary to a finding of guilty. *State v. Grim*, 854 S.W.2d 403, 411[5] (Mo.banc 1993). " 'The test is whether the evidence, so viewed, was sufficient to make a submissible case from which rational jurors could have found beyond a reasonable doubt that the defendant was guilty.' " *State v. Hopkins*, 841 S.W.2d 803, 804 (Mo.App.1992) (citation omitted). Appellate courts do not act as a "super juror with veto powers," but give great deference to the trier of fact. *Grim*, 854 S.W.2d at 414; *State v. Chaney*, 967 S.W.2d 47, 52 (Mo.banc), *cert. denied*, 525 U.S. 1021, 119 S.Ct. 551, 142 L.Ed.2d 458 (1998).

The elements of burglary in the first degree are set forth in § 569.160:

"1. A person commits the crime of burglary in the first degree if he knowingly *enters unlawfully* ... in a building or inhabitable structure for the purpose of committing a crime therein....

"(3) There is present in the structure another person who is not a participant in the crime." (Emphasis added.)

In the argument part of Defendant's brief, he first claims that ownership is an element of the crime. Later, as he discusses *State v. Fowler*, 938 S.W.2d 894 (Mo.banc 1997), Defendant concedes "ownership of the building in question is not an element of the offense of burglary...."

We agree *Fowler*, by analogy, teaches that identity of the owner of real estate is not an element of the crime of burglary. In *Fowler*, the information charged defendant with stealing property from Rhoda Blade, whereas the verdict director referred to property owned or in the possession of Lyle Blade. On appeal, the defendant complained he was prejudiced by the variance between the informa-

tion and the instruction. In rejecting that argument, the *Fowler* court declared:

"The identity of the owner is not an element of the crime with which [the defendant] was charged. Instead, the purposes of alleging, proving, and submitting for a jury finding, the ownership of property stolen are to show the ownership is not in the accused, to give notice to the accused of the crime for which he stands charged, and to bar subsequent prosecution of the accused for the same offense.... In summary, the state must prove that the property is 'of another,' but the state need not prove that the property belongs to a particular person. § 570.030."

938 S.W.2d at 896–97[4] (citations omitted).

When burglary is charged, there are reasons similar to those given in *Fowler* why "ownership" of the subject premises must be proven, even though ownership is not an element of the crime of burglary. The first reason is to show the premises are not the dwelling of the accused. *See State v. Rist*, 456 S.W.2d 13, 15 (Mo.1970); *State v. Ford*, 403 S.W.2d 611, 612 (Mo. 1966). The second reason is to identify the offense as to protect the accused from a second prosecution for the same offense. *Rist*, 456 S.W.2d at 15; *Ford*, 403 S.W.2d at 612.

Given the rationale for requiring proof of ownership in a burglary case, it follows that "[o]wnership in the context of a burglary does not mean title to the fee of the premises." *State v. Smith*, 626 S.W.2d 669, 671[3] (Mo.App.1981). "[I]n burglary prosecutions 'ownership' is not confined to title but also encompasses occupancy and possession." *State v. Fleming*, 518 S.W.2d 449, 450[1] (Mo.App.1975). " 'Proof of the ownership of a building burglarized does not refer to the title but the occupancy.' " *State v. Wilhite*, 587 S.W.2d 321, 323 (Mo. App.1979), *quoting State v. Rains*, 537 S.W.2d 219, 226[8] (Mo.App.1976).

Based on these authorities and considering the rationale for requiring proof

of ownership of the premises in a burglary case, we find the evidence here was sufficient to make a submissible case from which rational jurors could have found beyond a reasonable doubt Defendant was guilty. The evidence showed the house was legally owned by Robert, but was in the possession of Jeffrey. This is enough to show Defendant had no license or privilege to be in the house, i.e., he was there "unlawfully." § 569.010(8). The evidence was also sufficient to prevent a second prosecution, especially considering the fact the location of the house ("located at County Road D–76 one half mile east of Route D") was submitted to the jury in the instructions. When the information and jury instructions used the phrase "owned by Jeffrey Cullers," the state was required to prove Jeffrey owned the premises, possessed the premises, or occupied the premises. Defendant admits Jeffrey was in possession of the premises. For these reasons, Defendant's first point lacks merit. Point I is denied.[5]

*Point II: Admissibility of Defendant's Statements*

Defendant's second point maintains his statements to law enforcement officers should have been suppressed and kept out of evidence. The first of these statements was one Defendant gave Wormington at the county jail. Defendant claims this statement was involuntary and inadmissible because Wormington extracted it from him through a promise of leniency. To understand this argument requires a recital of additional facts.

■ Defendant first met Wormington before the burglary. At their initial meeting, Defendant "indicated to [Wormington] he wanted to be a cooperating informant for the drug task force." After Wormington's background check of Defendant revealed no pending charges or cases against him, they signed a "cooperating informant" contract. Wormington described the "contract" as containing the "do's and dont's" for a task force informant.

After the agreement, Wormington's next contact with Defendant came via a message from the McDonald County sheriff's office. The message was that Defendant was in jail and wanted to talk with Wormington. When Wormington went to see Defendant, he started his visit by giving Defendant his *Miranda* rights and warnings. Wormington testified that after the warnings, he told Defendant the following:

> "[BY WORMINGTON] I told [Defendant], I said listen, I understand, you know, that these are the charges that you are alleged to be here for. Whether right or not, I don't know. I told him that I had also talked with the prosecutor's office, and they had agreed to let me come down and speak with him. And that if he was a hundred percent honest with me, we would see what we could get done."

Defendant claims this statement, along with a leniency provision in the informant agreement, "clearly conveyed to [Defendant] that he would be granted leniency if he gave an honest statement[;]" conse-

---

5. We do not ignore the *Weekley* case on which Defendant relies but conclude it does not aid him. *State v. Weekley*, 967 S.W.2d 190 (Mo. App.1998). As *Weekley* explains, reversal occurred there because of "[t]he bizarre circumstances of [the] case." Id. at 194. The information in *Weekley* charged defendant with stealing two trucks, each having the same vehicle identification number except for the last digit thereof. One had a VIN ending with the digit "4," the other ending in digit "5." The jury convicted Defendant of stealing the truck with VIN 4 (Count I, Instruction 5) but acquitted him of stealing the truck with VIN 5 (Count II, Instruction 6). However, the State did not prove what VIN was on the stolen trucks nor prove what VIN was on each truck recovered. Without proof of the VINs there was no way to know which truck the jury convicted (or acquitted) defendant of stealing. 967 S.W.2d at 195. It was in that context that this court found reversible error because "one of the propositions hypothesized in the verdict-directing instruction was utterly without evidentiary support." Id. at 193. The unique facts of *Weekley* render it useless as support for Defendant's argument here.

quently, he insists his statement to Wormington was involuntary and inadmissible. We disagree.

"The test for whether a confession is voluntary is whether the totality of the circumstances created a physical or psychological coercion sufficient to deprive the defendant of a free choice to admit, deny or refuse to answer the examiner's questions." *State v. Simmons,* 944 S.W.2d 165, 173[4] (Mo.banc 1997). A statement extracted through a promise of leniency is inadmissible. *State v. Nicklasson,* 967 S.W.2d 596, 606[14] (Mo.banc), *cert. denied,* 525 U.S. 1021, 119 S.Ct. 549, 142 L.Ed.2d 457 (1998). While this is true, "officers' statements to a suspect that cooperating is in his or her best interests are not improperly coercive, and do not, as a matter of law, render a confession involuntary." *Simmons,* 944 S.W.2d at 175[13].

Under the totality of the circumstances, we cannot find (by what Wormington told Defendant) the statement to Wormington was made involuntarily. Wormington simply told Defendant he had "talked to the prosecutor and the sheriff and they had agreed to let [Wormington] come down and speak with [Defendant]." No reasonable person could interpret that remark as a direct or implied claim by Wormington that he had spoken with the sheriff or prosecutor regarding leniency toward Defendant. He encouraged Defendant to be "one hundred percent honest." At most, he implied if Defendant were honest, then he would talk to the prosecutor and sheriff to see what he "could get done." Encouragement to cooperate is far from a promise of leniency. *Nicklasson,* 967 S.W.2d at 606[16]. In *State v. Sutherland,* 11 S.W.3d 628 (Mo.App.1999), the interrogator told the defendant "if he cooperated 100 percent, he [police officer] would advise the prosecuting attorney of his 100 percent cooperation." *Id.* at 633. The police officer further advised the defendant "if he cooperated and the investigation was successful, that he may be a candidate for probation." *Id.* The *Sutherland* court reasoned these statements "simply encouraged appellant to cooperate and commented about the possible outcome of a criminal case against appellant." *Id.* Wormington's statement was far less explicit than those statements in *Sutherland.* It would strain our imagination to find his statement was anything more than encouragement to cooperate. "A confession, otherwise voluntary, is not tainted merely because the interrogating officer informs the suspect that if he gives a statement, the prosecutor or the court will be apprised that he cooperated." *State v. Clements,* 789 S.W.2d 101, 106[8] (Mo.App.1990).

We do not ignore the fact that Defendant was working with Wormington under an informant agreement. This agreement did contain a "leniency" provision. However, when the agreement was entered into, Defendant was told the provision did not apply to him. Furthermore, Defendant was told the agreement was merely a list of "do's and don'ts." Defendant contacted Wormington of his own volition and accord. Defendant was read his *Miranda* rights, and he then signed a waiver in which each and every line was initialed by Defendant. If Defendant had a hope of leniency, that hope sprang " 'from the seeds of his own planting [and] is not sufficient to render the resulting confession inadmissible.' " *State v. Skillicorn,* 944 S.W.2d 877, 890 (Mo.banc. 1997), quoting *State v. Hunter,* 456 S.W.2d 314, 321 (Mo.1970).

Defendant also claims as error those statements he made to McEntire. Defendant alleges the state failed to carry its burden in proving McEntire gave Defendant the necessary *Miranda* warnings before Defendant gave the statements. Specifically, Defendant points to inconsistencies in McEntire's testimony at the suppression hearing and the trial. Defendant claims the court should not have deemed

the officer to be a credible witness and should have excluded the statements.

■■■■ Once the admissibility of a statement has been challenged, the State has the burden of proof to show by preponderance of the evidence that the statement was voluntary. *State v. Smith,* 944 S.W.2d 901, 910 (Mo.banc 1997). "Any conflicts in the evidence are for the trial court to resolve, and this Court will defer to the trial court's superior position from which to assess credibility." *Simmons,* 944 S.W.2d at 173[5]. The facts and all reasonable inferences are viewed in favor of the ruling. *State v. Dye,* 946 S.W.2d 783, 786 (Mo.App.1997). The trial court's ruling will not be disturbed absent manifest error. *State v. Williams,* 956 S.W.2d 942, 948[12] (Mo.App.1997).

At the suppression hearing, McEntire's direct testimony claimed he was physically present for three separate statements when he was there for only two. Also, McEntire stated he had no written information regarding the case, when he had a prior statement. These discrepancies were brought to the court's attention on cross-examination. McEntire testified he was simply mistaken when he earlier testified differently. However, McEntire did testify he had orally read Defendant his *Miranda* rights, and Defendant acknowledged these rights and waived them. The initial mistakes in McEntire's testimony upon which Defendant focuses have nothing to do with voluntariness, but possibly reveal a bad memory. The state met its prima facie burden. The trial court was entitled to believe or disbelieve the officer's testimony regarding the reading of the warnings. *See State v. Feltrop,* 803 S.W.2d 1, 12 (Mo.banc 1991). The trial court chose to believe his testimony as was its prerogative.

■■■■ At the trial, McEntire again testified to the taking of the statements from Defendant. Defendant objected to the testimony, which the court overruled. Again, the deputy was cross-examined regarding the events. "The jury, not the appellate court, is responsible for weighing the reliability and credibility of the witnesses." *State v. Allison,* 845 S.W.2d 642, 645[5] (Mo.App.1992). A jury may believe all, some, or none of the testimony of any witness. *Id.* Any inconsistencies brought forth during the trial are for the jury to consider. *Id.* at 646[7]. We cannot resolve any credibility issues regarding McEntire. Point II denied.

*Point III: Closing Argument Comments Left Unchallenged at Trial*

Defendant's third point relied on urges reversal of his conviction because of closing argument comments made by the prosecuting attorney. Defendant concedes the prosecutor's closing argument comments were not subject to contemporaneous objection; consequently, they can be examined only under the plain error standard of Rule 30.20.[6] *State v. Bogard,* 836 S.W.2d 87, 88[1] (Mo.App.1992) (citing *State v. Roberts,* 709 S.W.2d 857, 864[6] (Mo.banc 1986)).

■■■ In requesting plain error review by this court, Defendant asserts the trial court plainly erred when it failed to declare a mistrial, *sua sponte,* following certain comments by the prosecutor during closing arguments, which resulted in manifest injustice. The first comment by the prosecutor stated, "the defense has shown no proof that Sam Weicht wasn't in that house to steal." Defendant claims this improperly shifted the burden of proof to him. The second comment referred to the deposition of Robert, and the prosecutor told the jury a part of that testimony was just a joke because: "I was there. I heard it." Defendant claims this was improper vouching for a witness.

---

6. Rule 30.20 provides, in pertinent part: "[P]lain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."

■ Missouri appellate courts "rarely grant relief on assertions of plain error as to closing argument ... because, in the absence of objection and request for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention." *State v. Clemmons*, 753 S.W.2d 901, 907–908 (Mo.banc 1988). *See* also *Bogard*, 836 S.W.2d at 89. "Because trial strategy looms as an important consideration in any trial, assertions of plain error concerning matters contained in closing argument are generally denied without explication." *Id. See State v. Amrine*, 741 S.W.2d 665, 669[1] (Mo.banc 1987); *State v. Wood*, 719 S.W.2d 756, 759[5] (Mo.banc 1986). In *State v. McMillin*, 783 S.W.2d 82 (Mo.banc 1990), our supreme court refused review of closing arguments stating, " 'The plain error rule should be used sparingly and does not justify a review of every trial error that has not been properly preserved for appellate review.' " 783 S.W.2d at 98 (citations omitted).

Adhering to the foregoing, we expressly refuse to review Defendant's complaints about the prosecutor's closing argument. Defendant waived his claim of error by failure to preserve error. *Bogard*, 836 S.W.2d at 89. Perhaps Defendant's lawyer "considered the remarks inconsequential not warranting objection or as trial strategy [counsel] set the stage for built in error." *See Wood*, 719 S.W.2d at 760. Whatever the reason, we decline to exercise our discretion to review under the plain error rule. We simply do not discern error that facially establishes substantial grounds for believing that manifest injustice has resulted. *See State v. Hughes*, 944 S.W.2d 247, 248[2] (Mo.App.1997).

The judgment of the trial court is affirmed.

PARRISH, P.J., CONCURS.

MONTGOMERY, J., CONCURS.