STATE of Missouri, Respondent,

v.

**Jason L. COKER, Appellant.**

No. 27353.

Missouri Court of Appeals, Southern District, Division Two.

Nov. 9, 2006.

Motion for Rehearing or Transfer Denied Dec. 4, 2006.

Application for Transfer Denied Jan. 30, 2007.

---

1. All statutory references are to RSMo 2000 unless otherwise indicated.

Kent Denzel, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Roger W. Johnson, Asst. Atty. Gen., Jefferson City, for respondent.

ROBERT S. BARNEY, Judge.

Jason L. Coker ("Appellant") appeals his conviction following a jury trial for two counts of statutory sodomy in the first degree, violations of section 566.062.[1] Appellant was sentenced by the trial court to fifteen years in the Department of Corrections on each count with the sentences to run concurrently. Appellant now brings four points on appeal.

"Viewing the evidence in the light most favorable to the jury's verdict," *State v. Smith*, 185 S.W.3d 747, 751 (Mo.App.2006), trial testimony reveals that in June of 2002 J.W., a six year old boy, resided with his father, W.W. ("Father"), and brother, A.W.[2] During the weekend of June 22, 2002, J.W. visited Mother at her apartment.[3] On the morning of June 22, 2002, while Mother was outside, J.W. was inside the apartment in Mother's bedroom watching television on her bed when Appellant

---

1. In order to protect the privacy of those involved, we choose not to refer to the victim and his family by name.

   All statutory references are to RSMo (2000), unless otherwise set out, and all Rule references are to Missouri Court Rules (2006).

2. Father, who is divorced from the children's mother, T.W. ("Mother"), has custody of J.W. and A.W. At the time of the incident in ques-

tion, Mother had visitation rights with the children and saw them every other weekend.

3. At that time, Mother was residing with a woman named Candie and Appellant apparently resided next door. Appellant and Mother had previously been romantically involved; however, the record is unclear as to whether they were romantically involved at the time of this incident.

came into the room. J.W. testified that Appellant "reached his hands up [his] shorts;" that Appellant "took his hand and put it up underneath [his] shorts" and underwear; that Appellant touched his "thing ... [he] go[es] pee out of ...;" and that Appellant "wiggl[ed] [his penis] around."

At trial, J.W. initially testified that Appellant only touched his penis; however, when the State reminded J.W. that he had reported to the Child Advocacy Center ("CAC") forensic interviewer, Mitzi Huffman ("Ms.Huffman"), that he had been "touched in the butt by [Appellant]," J.W. testified that Appellant had, in fact, touched him "[i]n the butt."[4] When asked what he meant by "[i]n the butt," J.W. stated "[a]round the crack" and also stated that "poop" comes out of that part of the body. J.W. also related these were the only times Appellant had touched him.[5]

The record also reveals that ten days after the aforementioned incident, J.W. told Father's girlfriend, A.C., that "he had been molested by [Appellant]."[6] A.C. informed Father that J.W. reported to her that Appellant had "forced [J.W.] to perform oral sex on him" and Father talked to J.W. about his allegations. J.W. informed Father that he had been forced to have oral sex with Appellant. Father then took J.W. to the police station. At the police station, Officer Cooper wrote the initial police report relating to the incident. Officer Cooper spoke with Father at that time, but did not interview J.W. Then Officer Cooper discussed the matter with his detective and placed a hotline call to the Department of Family Services, which arranged for J.W. to visit the CAC.

J.W. was interviewed at the CAC by Ms. Huffman on August 12, 2002.[7] J.W. told Ms. Huffman that Appellant "raped" him one night in Mother's bedroom while J.W. was watching television. He stated to Ms. Huffman that Appellant "just walked in and turned off the [TV] and then started in doing it." J.W. also stated that Appellant walked into the room and "held his one hand on [J.W.'s] stomach down on the bed" and "wouldn't let [him] up." J.W. related that Appellant reached underneath his shorts and "started rubbing [his penis]." J.W. also stated Appellant used his hands to touch him underneath his clothes and

4. It should be noted that the trial court found that any statements made by J.W. to Ms. Huffman were admissible pursuant to section 491.075.1(2)(a). During the course of the section 491.075 hearing held in this matter, J.W. variously testified he was touched "in the front" and "in the back" by Appellant; that Appellant "pushed [him] down on the ground and threatened [him] to have sex;" and that Appellant removed J.W.'s clothes before touching him. J.W. also testified Appellant "touched [him] with his hand;" touched him "[i]n the private;" touched him "in the front;" and touched him "in the back." J.W. also related Appellant "was playing with ..." his penis and that "when [Appellant] touched [him] in the back ..." he "rubb[ed] his hand over it." J.W. also testified that Appellant did *not* "put his finger inside [of him]" and that it "[ne]ver hurt."

5. We note, as detailed more fully below, that on cross-examination Appellant's attorney asked J.W. if he remembered testifying at the section 491.075 hearing that "nobody had ever put their finger inside [him]." J.W. testified that he remembered saying that and that it was "[t]rue." Defense counsel then asked, "[w]hich one's true, [J.W.]? Did somebody put a finger inside you at any point?" and J.W. answered "[n]o." On re-direct, after again repeating that he had not been touched "in the butt," he again stated Appellant had indeed "stuck [his] finger in [his] butt ...."

6. A.C. was married to Appellant at the time of trial.

7. The video of the interview and a transcript of the interview were entered into evidence at trial. The jury viewed the video during the course of the trial and requested to view it again during their deliberations.

that Appellant touched his "butt" with "[h]is hand and a belt." In explaining how Appellant touched him, Ms. Huffman asked J.W. to demonstrate:

Ms. Huffman: Show me how he took his hand ... Okay, here it is over here on this. Okay, he went underneath your shorts with his hand? Did he touch you underneath or on top of your clothing on your butt?

J.W.: Underneath.

Ms. Huffman: Underneath. And what did he do? If this is your butt, show me what he did with his hand.

J.W.: He just stuck his finger in it.

Ms. Huffman: Okay, he took his finger and stuck it in your butt? How many times did he do that?

J.W.: Once.

When Ms. Huffman asked J.W. "[h]ow did it feel when he touched you back here on your butt?" J.W. stated it "felt bad."

At trial, Ms. Huffman testified that when she asked J.W. to put a red dot on an anatomical drawing to show where he was touched, J.W. put a red dot on the "butt cheek," but that she felt like when she asked him to demonstrate where he was touched, he indicated his anus was actually penetrated.

Following her interview with J.W., Ms. Huffman performed a Sexual Assault Forensic Exam ("SAFE") on J.W.

Ms. Huffman, a registered nurse and a sexual assault nurse examiner, testified at trial that she did not notice anything unusual about J.W.'s penis. Regarding J.W.'s rectal area, she testified that J.W.'s "anal verge ... is very non-symmetric—it's irregular. We notice that in most six year olds ...." She also related that one area of J.W.'s rectum had a "decrease of ... subcutaneous [tissue in a certain] area ...;" that it was "white and scarred;" that it was "very distorted;" and that "it [wa]s

also very shiny." She stated that such findings are a "representation of stretching and not having the normal amount of subcutaneous tissue" in the rectal area. Ms. Huffman went on to state that there was a "gap" in the tissue around J.W.'s anus and that when he would try to "tighten the rectal area to close [it] ..." the area around the anus would not close all of the way. She stated that "[n]ormally the rectal area seals" and "the fact that this was opened and with [her] physically seeing that [J.W.] had a small amount of stool in his panties, was consistent with this child having an inability to keep the stool in the lower rectal area ...." Ms. Huffman also acknowledged that when she spoke with A.C., A.C. reported to her that J.W. "poops his pants all the time and he never wipes properly."

Ms. Huffman speculated that the injuries observed in J.W.'s anus "could be [from] a fingernail that caused trauma to that area going in" and that such an injury was consistent with what J.W. reported to her. She did note, however, that there were alternate explanations for the injuries she saw in J.W. She stated the injuries could have been from J.W. passing a hard stool or could have been from "irritation of the rectal area from soft stools."

She also related that because the skin in the rectum heals very rapidly, she and the doctor who treated J.W. had wanted to see J.W. again in two weeks so that they could examine him again. Ms. Huffman stated that, despite her repeated efforts, Father never brought J.W. back to be re-examined. Ms. Huffman explained that "[i]t would have been awfully helpful to [have seen] [J.W.] again." Furthermore, Ms. Huffman testified that while there "could have been any number of explanations ...," her exam revealed J.W. did not have "a normal healthy looking child's rectum," and a re-examination might have revealed

the cause of the abnormalities. She explained that her concern was whether "this [was] some type of medical manifestation, or was this an injury ... from ... a forceful penetration in the rectum ...." She stated that without a re-examination, she could not state the cause of the injuries to J.W.'s rectum. Ultimately, Ms. Huffman felt J.W.'s injuries were "consistent with [his] disclosure."

Lieutenant Bobby Siegrist ("Lieutenant Siegrist") of the Aurora Police Department testified that while he observed Ms. Huffman's interview with J.W. at the CAC from behind the one-way glass, he did not interview J.W. Lieutenant Siegrist stated that, as best he recalled, J.W. had disclosed that Appellant "had fondled" him; that Appellant "had him perform oral sex on him;" and that Appellant "had stuck his finger up [J.W.'s] anus." Lieutenant Siegrist stated, however, that he was never able to interview Mother, Father, or A.C. in connection with his investigation, but that he had spoken briefly with Mother by phone on one occasion.

Appellant was charged with two counts of statutory sodomy in the first degree, proscribed by section 566.062. In the First Amended Information, Count I recited that "between the 23rd day of June, 2002 and July 8, 2002, ... [Appellant] had deviate sexual intercourse with [J.W.], ... who was less than twelve years old, to wit: 6 years old, by touching the genitals of [J.W.] with [Appellant's] hand." Count II charged that "between the 23rd day of

June and 30th day of June, 2002 and the 8th day of July, 2002, ... [Appellant] had deviate sexual intercourse with [J.W.], ... who was less than twelve years old, to wit: 6 years old, by [Appellant] inserting his finger into the anus of [J.W.]."

Appellant did not testify on his own behalf at trial. Following deliberations, the jury convicted him of two counts of statutory sodomy in the first degree, and, as previously set out, he was sentenced to concurrent fifteen-year sentences in the Missouri Department of Corrections. This appeal followed. For ease of clarity and analysis, we take Appellant's points out of order and commence our discussion with an analysis of Appellant's second point.

■ In his second point on appeal, Appellant alleges the trial court erred when it refused to submit to the jury his proffered jury instruction for the lesser included offense of child molestation in the first degree, section 566.067, in conjunction with the State's submission of its Count II instruction for statutory sodomy in the first degree, section 566.062.[8] Appellant argues there was evidence that would support a conviction of child molestation in the first degree and acquittal of statutory sodomy in the first degree. We agree.

At trial, Appellant proffered to the trial court a lesser included offense instruction of child molestation in the first degree relative to the Count II instruction for sodomy in the first degree.[9] Defense

---

8. Appellant does not challenge the trial court's denial of his request for a lesser included offense instruction as to Count I.

9. Appellant's proposed "INSTRUCTION NO. B" set out, as follows:

As to Count II, if you find and believe from the evidence beyond a reasonable doubt: First, that on or about the 23rd day of June, 2002 through the 8th day of July, 2002, in the County of Lawrence State of Missouri, [Appellant] touched the anus of [J.W.], and Second, that he did so for the purpose of arousing his own sexual desire, and Third, that [J.W.] was then less than fourteen years old, Then you will find [Appellant] guilty under Count II of child molestation in the first degree.

counsel argued the lesser included offense instruction was necessary as "there is an opportunity for the jury to find that one of the requirements under statutory sodomy; that penetration, however slight, occurred, they could find that no penetration, in fact, occurred in this case and that was merely in touching, and, therefore satisfying the requirements for a lesser included." The State argued against the giving of the lesser included offense instruction. The trial court ruled it was not going to submit the lesser included offense instruction of child molestation in the first degree to the jury because it did not "believe that child molestation in the first degree is a lesser included of the offenses charged."

Section 556.046, RSMo Cum.Supp. (2005), provides in pertinent part, as follows:

1. A defendant may be convicted of an offense included in an offense charged in the indictment or information. An offense is so included when

(1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

(2) It is specifically denominated by statute as a lesser degree of the offense charged;

\* \* \*

2. The court shall not be obligated to charge the jury with respect to an included offense unless there is a basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense . . . .

3. The court shall be obligated to instruct the jury with respect to a particular included offense only if there is a basis in the evidence for acquitting the defendant of the immediately higher included offense and there is a basis in the evidence for convicting the defendant of that particular included offense.

■ "A lesser-included offense is an offense established by proof of the same or less than all the facts required to establish the commission of the charged offense." *State v. Whiteley*, 184 S.W.3d 620, 623 (Mo.App.2006); *see State v. Derenzy*, 89 S.W.3d 472, 474 (Mo. banc 2002). "An offense is a lesser-included offense if it is impossible to commit the charged offense without necessarily committing the lesser." *Whiteley*, 184 S.W.3d at 623. A "trial court is required to instruct the jury on a lesser included offense if the evidence shows the lack of an essential element of the greater offense, thereby providing a basis for a verdict acquitting the defendant of the greater offense and convicting the defendant of the lesser offense." *State v. Barnard*, 972 S.W.2d 462, 464 (Mo.App.1998). "For there to be a basis for an acquittal of the greater offense, there must be a questionable essential element of the greater offense." *Derenzy*, 89 S.W.3d at 474. "Doubts concerning whether to instruct on a lesser-included charge should be resolved in favor of including the instruction . . . ." *Id.* "If a reasonable juror could draw inferences from the evidence presented that an essential element of the greater offense has not been established, the trial court should instruct down." *Id.* "However, there must be evidence in the record to support the giving of the instruction." *Barnard*, 972 S.W.2d at 464. "In its absence, a trial court should not instruct on a lesser-included offense merely because the jury might disbelieve some of the [S]tate's evidence or decline to draw some or all of the permissible inferences." *Id.* at 464–65.

■ "In determining whether the court erred in not giving an instruction on a lesser-included offense, there are two questions to be answered: (1) was the offense a lesser-included offense, and (2) was the evidence such that it was error not

to give the instruction." *Barnard,* 972 S.W.2d at 465.

We now turn to the issue of whether the evidence was such that it was error for the trial court to decline to give the lesser included offense instruction. We begin by examining whether one offense is a lesser included of the other and our analysis focuses on the elements required by the statutes proscribing the offenses. *State v. Mizanskey,* 901 S.W.2d 95, 98 (Mo.App. 1995).

Section 566.062.1 states that "[a] person commits the crime of statutory sodomy in the first degree if he has deviate sexual intercourse with another person who is less than fourteen years old." "Deviate sexual intercourse" is defined in section 566.010(1) as "any act involving the genitals of one person and the hand, mouth, tongue, or anus of another person or a sexual act involving the penetration, however slight, of the male or female sex organ or the anus by a finger, instrument or object done for the purpose of arousing or gratifying the sexual desire of any person . . . ." As such, the verdict director as to Count II required the State to prove (1) that Appellant "inserted his finger into the anus of [J.W.];" (2) "that such conduct constituted deviate sexual intercourse;"[10] and (3) that J.W. "was less than twelve years old."

As for child molestation in the first degree, section 566.067 sets out that "[a] person commits the crime of child molestation in the first degree if he or she subjects another person who is less than fourteen years of age to sexual contact." "Sexual contact" is defined in section 566.010(3) as "any touching of another person with the genitals or any touching of the genitals or anus of another person, or the breast of a female person, for the purpose of arousing or gratifying sexual desire of any person . . . ."

In the verdict director instruction submitted by Appellant and rejected by the trial court, the State would have been required to prove (1) Appellant "touched the anus of [J.W.];" (2) "he did so for the purpose of arousing his own sexual desire;" and (3) J.W. "was then less than fourteen years old."

■ As previously related, trial courts are only required to give an instruction on a lesser included offense if such an instruction is supported by the evidence adduced at trial. § 556.046, RSMo Cum.Supp. (2005); *Barnard,* 972 S.W.2d at 464. If a reasonable juror could draw inferences from the evidence presented that an essential element of the greater offense has not been established, the trial court should instruct down. *State v. Hineman,* 14 S.W.3d 924, 927 (Mo. banc 1999). A "defendant is not required to put on affirmative evidence as to the lack of an essential element of the higher offense." *Id.*

In the present matter, it appears to this Court that there was evidence adduced at trial which would have provided a basis for acquitting Appellant of statutory sodomy in the first degree and convicting him of child molestation in the first degree.

We begin by examining J.W.'s trial testimony. On direct examination at trial, after J.W. had testified that Appellant touched his "thing . . . [he] go[es] pee out of . . .," the following testimony occurred:

> The State: Okay. Did anything else happen while you were in there in the bathroom—bedroom, at that time?

---

**10.** We note that while the statutory sodomy verdict director did not specifically require the State to prove Appellant acted "for the purpose of arousing or gratifying [his] sexual

desire . . ." such a requirement is implicit in the requirement that the jury find the act "constituted deviate sexual intercourse." *See* § 566.010(1).

J.W.: No.

The State: Okay. Did—Were you touched anywhere else, that you remember?

J.W.: No.

The State: Okay. Do you remember talking at the [CAC] about being touched?

J.W.: Yes.

* * *

The State: Okay. Do you remember telling [Ms. Huffman] that you were touched in the butt by [Appellant]?

J.W.: No.

The State: You don't remember that? Would that be a true [sic] or a lie that [Appellant] touched you in the butt?

J.W.: True.

The State: Well, tell us when he touched you—you said earlier he didn't touch you anywhere else. Did he touch you someplace else?

J.W.: Yes.

The State: Where else did he touch you?

J.W.: In the butt.

The State: What—Where is the butt—When you say, the butt, what are you talking about?

J.W.: Around the crack.

The State: Okay. What happens where he touched you at? When you—Do you ever go to the bathroom from there?

J.W.: Yes.

The State: And what—when you go to the bathroom, what comes out of this portion of your body?

J.W.: Poop.

The State: Poop. Okay. Do you remember telling that—[Ms.] Huffman when she was having you look at this [drawing of a body], that you were touched on the butt and drawing that red line on there
. . . .

J.W.: Huh-uh.

The State: You don't remember. Okay. Did you tell her what that felt like—would you tell the jury what it felt like when you were touched on the butt?

J.W.: Mad.

* * *

The State: Who touched you on the butt?

J.W.: [Appellant].

Then on cross-examination by defense counsel, the following exchange took place:

Defense counsel: And do you remember telling that attorney [at the section 419.075 hearing] that nobody had ever put their finger inside you?

J.W.: Yes.

Defense counsel: Is that true?

J.W.: Yes.

* * *

Defense counsel: Which one's true, [J.W.] [d]id somebody put a finger inside you at any point?

J.W.: No.

Thereafter, on re-direct by the State, J.W. testified to the following:

The State: [J.W.], when you said nobody stuck their finger in your butt, earlier you said somebody did, now which is true? Did somebody stick their finger in your butt or not?

J.W.: They didn't.

The State: What?

J.W.: They didn't.

The State: They didn't? Nobody has ever stuck their finger in your butt, then?

J.W.: No.

The State: Okay. You said earlier that somebody did stick their finger in your butt. You said [Appellant] did, earlier. Or did I have that wrong? Nobody—

J.W.: You had it wrong.

The State: Okay. So what happened, at your mom's apartment?

J.W.: [Appellant] molested me.

The State: Well, how did he molest you?

J.W.: He rubbed his fingers over my thing.

The State: On your—on your thing— the front of you. But he didn't touch you in the butt?

J.W.: He did.

The State: He did or he didn't?

J.W.: He did it.

The State: He did touch you. Well, you said earlier that he didn't. I'm just trying to find out the truth. Just tell the truth, that's all we're after here today.

J.W.: He did.

The State: He did touch—he did stick his finger in your butt?

J.W.: Yes.

The State: Okay. Because it's very important to us. We don't want somebody being convicted of something that they didn't do. Okay?

J.W.: Yes.

The State: And it's very important that we know the truth. So what happened?

J.W.: [Appellant] molested me.

The State: Okay. But what did he do to you?

J.W.: He rubbed his finger over my thing and he stuck his finger in my butt.

The State: Okay. And how did it feel when he stuck his finger in your butt?

J.W.: Bad.

Then, on re-cross by defense counsel the following was elicited:

Defense counsel: Well, now, [J.W.], when you testified previously, you told us that he put his hand on your butt, but he never put his finger in it. And, then, you told us earlier today he—again you told us he never put his finger in it, but

that he had touched you. So did he just touch it, or did he put his finger in it?

J.W.: Put his finger in it.

Defense counsel: Okay. So why would you tell us before that he didn't put his finger in it?

J.W.: I don't know. I don't like talking about my past.

Defense counsel: Okay. Why did you tell us back on that day that he didn't put his finger in it, and when you were asked, Did it hurt—did it ever hurt?, you said, No? Well, there were fewer people there on that day that we were talking about it; isn't that—wasn't that true?

J.W.: Yes.

Our review of the record reveals that J.W. initially reported to A.C., Father, Officer Cooper, and Lieutenant Siegrist that he had been forced to engage in oral sex with Appellant. Then, J.W. reported to Ms. Huffman at the CAC interview that he had been "raped" by Appellant; that Appellant "touched" his "butt" with "[h]is hand;" that Appellant "stuck his finger in [his butt];" and that it "felt bad" when he was "touched" on his "butt." However, when Ms. Huffman had J.W. mark on the anatomical drawing the location where he was touched by Appellant, J.W. placed the mark on the "butt cheek." Thereafter, J.W. testified at the section 491.075 hearing that Appellant did not, in fact, "put his finger inside [of him]" and that Appellant "touched [him] in the back ...." At trial, J.W. variously testified that he was not "touched in the butt by [Appellant];" that he was "touched on the butt" by Appellant; that "[nobody] put a finger inside [him] at any point;" and that Appellant "stuck his finger in [his] butt." Accordingly, although J.W. testified on direct examination at trial that Appellant touched him "[i]n

the butt," he also testified on cross-examination that Appellant did not do so.

We are aware that a "jury may accept part of a witness's testimony, but disbelieve other parts." *State v. Pond,* 131 S.W.3d 792, 794 (Mo. banc 2004). The jury could have believed part of J.W.'s testimony and disbelieved part of J.W.'s testimony. Depending on which evidence the jury believed, the jury could have acquitted Appellant of statutory sodomy in the first degree by finding Appellant did not digitally penetrate J.W.'s anus, and could have convicted him of child molestation in the first degree by finding instead that Appellant *touched* J.W.'s anus.[11] As previously stated, "[w]hen reviewing whether a defendant is entitled to a particular instruction, we review in a light most favorable to defendant." *State v. Edwards,* 980 S.W.2d 75, 76 (Mo.App.1998). "[I]f there is any doubt upon the evidence, the trial court should resolve any doubts in favor of instructing on the lower degree of the crime, leaving it to the jury to decide of two or more grades on an offense, if any, the defendant is guilty." *State v. Santillan,* 948 S.W.2d 574, 577 (Mo. banc 1997).

There is evidence in the record before this Court which would provide a basis for acquitting Appellant of the greater offense of statutory sodomy in the first degree and convicting Appellant of the lesser offense of child molestation in the first degree as

to Count II. *See Derenzy,* 89 S.W.3d at 474. This Court leaves to the jury determining the credibility of witnesses, resolving conflicts in testimony, and weighing evidence. *Rousan v. State,* 48 S.W.3d 576, 595 (Mo. banc 2001). In the case at bar, there was enough evidence adduced at trial to warrant the submission of the jury instruction for the lesser-included offense of child molestation. It was error not to give Appellant's tendered instruction. Such error requires reversal and remand for a new trial. *Pond,* 131 S.W.3d at 795. Appellant's second point has merit.

We turn now to Appellant's remaining points on appeal. In his first point relied on, Appellant contends the trial court erred in overruling his motion for judgment of acquittal at the close of all the evidence and in entering a verdict of guilty on Count II. Appellant's fourth point on appeal maintains the trial court plainly erred "in failing to consider the full statutory range of punishment . . . ." Based on our determination that Point II has merit and warrants reversal and remand, we need not address Appellant's assertions of trial court error under points one and four.

■ In his third point on appeal, Appellant asserts the trial court plainly erred in failing to *sua sponte* instruct the jury to disregard the State's arguments made during closing argument relating, as Appellant terms it, to his "failure to testify" at trial,

11. This Court is cognizant of the use of certain phrases in the record which are imprecise and inexact. The record is replete with instances of the use of assorted phrases such as "touched in the butt" and "touched on the butt," not only by J.W., but also by the State, defense counsel and other witnesses. The majority of the time the record is unclear as to whether "in the butt" is a reference to J.W. being touched between the butt cheeks; touched on the anus without any actual digital penetration of the anus; or touched on the anus with digital penetration of the anus.

The only time J.W. himself made any type of specific differentiation between the two scenarios was during his CAC interview with Ms. Huffman. Ms. Huffman asked J.W. to demonstrate how he was touched and she made a fist with the end of her hand presumably to represent his anus. She asked J.W. to show her how he was touched and he touched the middle of the end of her fist with his outstretched finger. In the record, the State repeatedly asked J.W. about being *touched* "in the butt" or "on the butt."

thereby violating his federal and constitutional rights arising from his right "to remain silent." [12]

During its closing argument, the State made the following argument:

It's hard not to get impassioned about a case like this. Because our children have to be protected. And sometimes our parents don't protect them. Sometimes the mothers don't watch over who they're with, and allow their own people to be around their children. That is not [J.W.'s] fault. It's not a six-year-old's fault. It may be the fault of a parent, but it is not the fault of [J.W.]. And I submit that he's the one that came in and told you, ladies and gentlemen, what happened.

There's an instruction about believability of witnesses, and why they're here. Do we believe him? If you do, you're going to find [Appellant] guilty. If you don't believe [J.W.], you're going to find [Appellant] not guilty. It's not about all the other people that didn't testify, ladies and gentlemen. That's not what this case is about. It's about the evidence you've heard in this courtroom from the witnesses. It's not about who you didn't hear from.

Appellant failed to object to the State's comments at the time they were made and, also, did not raise this claim in his motion for new trial. *See* Rules 30.20 and 78.07. Therefore, he did not preserve this issue for our review. *State v. Bowles,* 23 S.W.3d 775, 782 (Mo.App.2000). Nonetheless, Appellant requests that we review it for plain error pursuant to Rule 30.20.

■ Plain error review is used sparingly and is limited to those cases where there is a clear demonstration of manifest injustice or miscarriage of justice. *State v. Ballard,* 6 S.W.3d 210, 214 (Mo. App.1999). Claims of plain error are reviewed "under a two-prong standard." *State v. Roper,* 136 S.W.3d 891, 900 (Mo. App.2004). "In the first prong, we determine whether there is, indeed, plain error, which is error that is 'evident, obvious, and clear.'" *Id.* (quoting *State v. Scurlock,* 998 S.W.2d 578, 586 (Mo.App.1999)). "If so, then we look to the second prong of the analysis, which considers whether a manifest injustice or miscarriage of justice has, indeed, occurred as a result of the error." *Roper,* 136 S.W.3d at 900. "A criminal defendant seeking plain error review bears the burden of showing that plain error occurred and that it resulted in a manifest injustice or miscarriage of justice." *Id.* "The outcome of plain error review depends heavily on the specific facts and circumstances of each case." *Id.*

■ "[P]lain error will seldom be found in unobjected closing argument." *State v. Kempker,* 824 S.W.2d 909, 911 (Mo. banc 1992). This is because "alleged errors committed in closing argument do not justify relief under the plain error rule unless they are determined to have a decisive effect on the jury." *State v. Sidebottom,* 753 S.W.2d 915, 920 (Mo. banc 1988). In that " 'trial strategy looms as an important consideration in any trial, assertions of plain error concerning matters contained in closing argument are generally denied without explication.'" *State v. Weicht,* 23 S.W.3d 922, 930 (Mo.App.2000) (quoting *State v. Clemmons,* 753 S.W.2d 901, 907–08 (Mo. banc 1988)). We choose to examine Appellant's claim of plain error *ex gratia.*

■ It has long been held that comments by the State and the trial court "on

---

**12.** As we are reversing and remanding Appellant's conviction for statutory sodomy under Count II, we address Appellant's third point only as it relates to his conviction for statutory sodomy under Count I.

the exercise of the defendant's right not to testify are forbidden." *State v. Tolliver,* 101 S.W.3d 313, 317 (Mo.App.2003). "A direct reference to a defendant's failure to testify is made when the [State's] reference is definite and certain, such as by the use of the words 'defendant,' 'accused,' and 'testify or their equivalent.'" *State v. Dees,* 916 S.W.2d 287, 295 (Mo.App.1995). By contrast, an indirect reference is one that is reasonably apt to direct the jury's attention to an accused's failure to testify. *State v. Lawhorn,* 762 S.W.2d 820, 826 (Mo. banc 1988). "An indirect reference ..., however, requires reversal only if the [S]tate makes it with 'a calculated intent to magnify' the defendant's decision not to testify so as to call it to the jury's attention." *Bowles,* 23 S.W.3d at 782 (quoting *State v. Richardson,* 923 S.W.2d 301, 314 (Mo. banc 1996)). "While direct [and] indirect comments on a defendant's failure to testify are forbidden, the Supreme Court has instructed that, when reviewing a defendant's claim of an improper comment

on his right not to testify, we must consider the comment 'in the context in which it appears.'" *Bowles,* 23 S.W.3d at 782 (quoting *State v. Neff,* 978 S.W.2d 341, 345 (Mo. banc 1998)) (internal citations omitted). "We will reverse a conviction for improper closing argument only if [Appellant] establishes that the comment had a decisive effect on the jury's determination." *Bowles,* 23 S.W.3d at 782.

█ Taking the present statement in context, we find no indication that the State intended to call the jury's attention to the fact that Appellant did not testify. *See Neff,* 978 S.W.2d at 345.

At the beginning of trial, defense counsel argued in opening statement that his theory of the case was that A.C. convinced J.W. to fabricate the incident with Appellant. The evidence presented by Appellant at trial was consistent with his theory that A.C. convinced J.W. to lie about the entire incident.[13] Defense counsel also cross-examined Officer Cooper and Lieu-

---

**13.** On his behalf, Appellant offered the testimony of D.G., D.S., and Mother. D.G., who has a daughter with A.C., testified that he often had contact with Appellant when he went to pick up his daughter from her visits with A.C. D.G. testified he has full custody of the daughter he had with A.C. He related that when their daughter was three years old A.C. accused him of molesting her, but the allegations were proven to be unsubstantiated.

D.S., A.C.'s former aunt and a friend of both Mother and Appellant, also testified on Appellant's behalf. D.S. stated that A.C. is "not mentally stable" and had abused D.S.'s children by tying them up and physically abusing them. D.S. stated she was present at the section 491.075 hearing held on July 29, 2003. She testified that following the hearing at which J.W. testified Appellant had *not* "put his finger inside [of him]," she had observed J.W. and Father leaving the courtroom. She related that Father appeared angry at J.W. and that as "they walked out and was [sic] going toward the elevator [she] saw [Father] smack [J.W.] upside the head." She "didn't

hear everything that was said, but [she] did hear the fact that [J.W.] had changed his story."

Mother testified that J.W. never told her that anything had happened between him and Appellant, but that she would have expected him to tell her if something had happened. She testified that she could not remember a time when Appellant and J.W. would have ever been alone in the apartment without other people being present. Mother also related that on the weekend in question, she left J.W. in the apartment for twenty minutes with Appellant and three other adults "[w]hen [she] walked to the store to get ... everybody some soda." Mother also testified that she told Lieutenant Siegrist that A.C. "told [her] that [she] needed ... to make [Appellant] give her a divorce, or she was going to 'f' my world and [Appellant's] world both up." Mother likewise related that she also witnessed Father "smacking [J.W.] in the back of the head" after the section 419.075 hearing, but that she did not hear what Father said to J.W.

tenant Siegrist about their failure to interview and investigate A.C., as well as their failure to elicit evidence from other witnesses relating to A.C.'s character.

In closing argument, the State made the argument detailed above in response to the fact that Appellant accused A.C. of being complicit in this matter, but did not call A.C. to testify at trial. It is our view that the State's comment that "[i]t's about the evidence you've heard in this courtroom from the witnesses. It's not about who you didn't hear from," was not a reference to Appellant's failure to testify. Rather, it was a reference to Appellant's failure to produce A.C. to testify at trial. This is evident based on the fact that in its rebuttal closing argument, the State noted that "both sides [have] the ability to bring witnesses into this court; it's called a subpoena. We brought the witnesses into the court that we needed to firmly convince you of what happened."

The comments at issue were neither direct or indirect references to Appellant's failure to testify. *Bowles,* 23 S.W.3d at 782. As such, Appellant has failed to establish "that the comment had a decisive effect on the jury's determination." *Id.* Appellant has failed to prove " there is, indeed, plain error, which is error that is 'evident, obvious, and clear.' " *Roper,* 136 S.W.3d at 900. We decline plain error review. Appellant's third point is denied.

Appellant's conviction for statutory sodomy under Count I is affirmed. We reverse Appellant's conviction under Count II for statutory sodomy in the first degree and remand.

BATES, C.J., and LYNCH, J., concur.